# UNITED STATES *v.* BAGLEY

No. 84–48.  Argued March 20, 1985—Decided July 2, 1985

BLACKMUN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined, and an opinion with respect to Part III, in which O'CONNOR, J., joined. WHITE, J., filed

an opinion concurring in part and concurring in the judgment, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 685. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 685. STEVENS, J., filed a dissenting opinion, *post*, p. 709. POWELL, J., took no part in the decision of the case.

*David A. Strauss* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott,* and *Deputy Solicitor General Frey.*

*Thomas W. Hillier II* argued the cause and filed a brief for respondent.*

JUSTICE BLACKMUN announced the judgment of the Court and delivered an opinion of the Court except as to Part III.

In *Brady* v. *Maryland*, 373 U. S. 83, 87 (1963), this Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." The issue in the present case concerns the standard of materiality to be applied in determining whether a conviction should be reversed because the prosecutor failed to disclose requested evidence that could have been used to impeach Government witnesses.

I

In October 1977, respondent Hughes Anderson Bagley was indicted in the Western District of Washington on 15 charges of violating federal narcotics and firearms statutes. On November 18, 24 days before trial, respondent filed a discovery motion. The sixth paragraph of that motion requested:

"The names and addresses of witnesses that the government intends to call at trial. Also the prior criminal records of witnesses, and any deals, promises or induce-

---

*John K. Van de Kamp*, Attorney General, and *Karl S. Mayer, Thomas A. Brady,* and *Charles R. B. Kirk,* Deputy Attorneys General, filed a brief for the State of California as *amicus curiae* urging reversal.

ments made to witnesses in exchange for their testimony." App. 18.[1]

The Government's two principal witnesses at the trial were James F. O'Connor and Donald E. Mitchell. O'Connor and Mitchell were state law enforcement officers employed by the Milwaukee Railroad as private security guards. Between April and June 1977, they assisted the federal Bureau of Alcohol, Tobacco and Firearms (ATF) in conducting an undercover investigation of respondent.

The Government's response to the discovery motion did not disclose that any "deals, promises or inducements" had been made to O'Connor or Mitchell. In apparent reply to a request in the motion's ninth paragraph for "[c]opies of all Jencks Act material,"[2] the Government produced a series of affidavits that O'Connor and Mitchell had signed between April 12 and May 4, 1977, while the undercover investigation was in progress. These affidavits recounted in detail the undercover dealings that O'Connor and Mitchell were having at the time with respondent. Each affidavit concluded with the statement, "I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it."[3]

Respondent waived his right to a jury trial and was tried before the court in December 1977. At the trial, O'Connor

---

[1] In addition, ¶ 10(b) of the motion requested "[p]romises or representations made to any persons the government intends to call as witnesses at trial, including but not limited to promises of no prosecution, immunity, lesser sentence, etc.," and ¶ 11 requested "[a]ll information which would establish the reliability of the Milwaukee Railroad Employees in this case, whose testimony formed the basis for the search warrant." App. 18–19.

[2] The Jencks Act, 18 U. S. C. § 3500, requires the prosecutor to disclose, after direct examination of a Government witness and on the defendant's motion, any statement of the witness in the Government's possession that relates to the subject matter of the witness' testimony.

[3] Brief for United States 3, quoting Memorandum of Points and Authorities in Support of Pet. for Habeas Corpus, CV80–3592–RJK(M) (CD Cal.) Exhibits 1–9.

and Mitchell testified about both the firearms and the narcotics charges. On December 23, the court found respondent guilty on the narcotics charges, but not guilty on the firearms charges.

In mid-1980, respondent filed requests for information pursuant to the Freedom of Information Act and to the Privacy Act of 1974, 5 U. S. C. §§ 552 and 552a. He received in response copies of ATF form contracts that O'Connor and Mitchell had signed on May 3, 1977. Each form was entitled "Contract for Purchase of Information and Payment of Lump Sum Therefor." The printed portion of the form stated that the vendor "will provide" information to ATF and that "upon receipt of such information by the Regional Director, Bureau of Alcohol, Tobacco and Firearms, or his representative, and upon the accomplishment of the objective sought to be obtained by the use of such information to the satisfaction of said Regional Director, the United States will pay to said vendor a sum commensurate with services and information rendered." App. 22 and 23. Each form contained the following typewritten description of services:

> "That he will provide information regarding T–I and other violations committed by Hughes A. Bagley, Jr.; that he will purchase evidence for ATF; that he will cut *[sic]* in an undercover capacity for ATF; that he will assist ATF in gathering of evidence and testify against the violator in federal court." *Ibid.*

The figure "$300.00" was handwritten in each form on a line entitled "Sum to Be Paid to Vendor."

Because these contracts had not been disclosed to respondent in response to his pretrial discovery motion,[4] respondent moved under 28 U. S. C. § 2255 to vacate his sentence. He

---

[4] The Assistant United States Attorney who prosecuted respondent stated in stipulated testimony that he had not known that the contracts existed and that he would have furnished them to respondent had he known of them. See App. to Pet. for Cert. 13a.

alleged that the Government's failure to disclose the contracts, which he could have used to impeach O'Connor and Mitchell, violated his right to due process under *Brady* v. *Maryland, supra.*

The motion came before the same District Judge who had presided at respondent's bench trial. An evidentiary hearing was held before a Magistrate. The Magistrate found that the printed form contracts were blank when O'Connor and Mitchell signed them and were not signed by an ATF representative until after the trial. He also found that on January 4, 1978, following the trial and decision in respondent's case, ATF made payments of $300 to both O'Connor and Mitchell pursuant to the contracts.[5] Although the ATF case agent who dealt with O'Connor and Mitchell testified that these payments were compensation for expenses, the Magistrate found that this characterization was not borne out by the record. There was no documentation for expenses in these amounts; Mitchell testified that his payment was not for expenses, and the ATF forms authorizing the payments treated them as rewards.

The District Court adopted each of the Magistrate's findings except for the last one to the effect that "[n]either O'Connor nor Mitchell expected to receive the payment of $300 or any payment from the United States for their testimony." App. to Pet. for Cert. 7a, 12a, 14a. Instead, the court found that it was "probable" that O'Connor and Mitchell expected to receive compensation, in addition to their expenses, for their assistance, "though perhaps not for their testimony." *Id.*, at 7a. The District Court also expressly rejected, *ibid.*, the Magistrate's conclusion, *id.*, at 14a, that:

---

[5] The Magistrate found, too, that ATF paid O'Connor and Mitchell, respectively, $90 and $80 in April and May 1977 before trial, but concluded that these payments were intended to reimburse O'Connor and Mitchell for expenses, and would not have provided a basis for impeaching O'Connor's and Mitchell's trial testimony. The District Court adopted this finding and conclusion. *Id.*, at 7a, 13a.

"Because neither witness was promised or expected payment for his testimony, the United States did not withhold, during pretrial discovery, information as to any 'deals, promises or inducements' to these witnesses. Nor did the United States suppress evidence favorable to the defendant, in violation of *Brady* v. *Maryland*, 373 U. S. 83 (1963)."

The District Court found beyond a reasonable doubt, however, that had the existence of the agreements been disclosed to it during trial, the disclosure would have had no effect upon its finding that the Government had proved beyond a reasonable doubt that respondent was guilty of the offenses for which he had been convicted. *Id.*, at 8a. The District Court reasoned: Almost all of the testimony of both witnesses was devoted to the firearms charges in the indictment. Respondent, however, was acquitted on those charges. The testimony of O'Connor and Mitchell concerning the narcotics charges was relatively very brief. On cross-examination, respondent's counsel did not seek to discredit their testimony as to the facts of distribution but rather sought to show that the controlled substances in question came from supplies that had been prescribed for respondent's personal use. The answers of O'Connor and Mitchell to this line of cross-examination tended to be favorable to respondent. Thus, the claimed impeachment evidence would not have been helpful to respondent and would not have affected the outcome of the trial. Accordingly, the District Court denied respondent's motion to vacate his sentence.

The United States Court of Appeals for the Ninth Circuit reversed. *Bagley* v. *Lumpkin*, 719 F. 2d 1462 (1983). The Court of Appeals began by noting that, according to precedent in the Circuit, prosecutorial failure to respond to a specific *Brady* request is properly analyzed as error, and a resulting conviction must be reversed unless the error is harmless beyond a reasonable doubt. The court noted that the District Judge who had presided over the bench trial

concluded beyond a reasonable doubt that disclosure of the ATF agreement would not have affected the outcome. The Court of Appeals, however, stated that it "disagree[d]" with this conclusion. *Id.*, at 1464. In particular, it disagreed with the Government's—and the District Court's—premise that the testimony of O'Connor and Mitchell was exculpatory on the narcotics charges, and that respondent therefore would not have sought to impeach "his own witness." *Id.*, at 1464, n. 1.

The Court of Appeals apparently based its reversal, however, on the theory that the Government's failure to disclose the requested *Brady* information that respondent could have used to conduct an effective cross-examination impaired respondent's right to confront adverse witnesses. The court noted: "In *Davis* v. *Alaska,* . . . the Supreme Court held that the denial of the 'right of *effective* cross-examination' was '"constitutional error of the first magnitude"' requiring automatic reversal." 719 F. 2d, at 1464 (quoting *Davis* v. *Alaska,* 415 U. S. 308, 318 (1974)) (emphasis added by Court of Appeals). In the last sentence of its opinion, the Court of Appeals concluded: "we hold that the government's failure to provide requested *Brady* information to Bagley so that he could effectively cross-examine two important government witnesses requires an automatic reversal." 719 F. 2d, at 1464.

We granted certiorari, 469 U. S. 1016 (1984), and we now reverse.

## II

The holding in *Brady* v. *Maryland* requires disclosure only of evidence that is both favorable to the accused and "material either to guilt or to punishment." 373 U. S., at 87. See also *Moore* v. *Illinois,* 408 U. S. 786, 794–795 (1972). The Court explained in *United States* v. *Agurs,* 427 U. S. 97, 104 (1976): "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of

the trial." The evidence suppressed in *Brady* would have been admissible only on the issue of punishment and not on the issue of guilt, and therefore could have affected only Brady's sentence and not his conviction. Accordingly, the Court affirmed the lower court's restriction of Brady's new trial to the issue of punishment.

The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.[6] Thus, the prosecutor is not required to deliver his entire file to defense counsel,[7] but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial:

> "For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose. . . .
>
> ". . . But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclo-

---

[6] By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized, however, that the prosecutor's role transcends that of an adversary: he "is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger* v. *United States*, 295 U. S. 78, 88 (1935). See *Brady* v. *Maryland*, 373 U. S., at 87–88.

[7] See *United States* v. *Agurs*, 427 U. S. 97, 106, 111 (1976); *Moore* v. *Illinois*, 408 U. S. 786, 795 (1972). See also *California* v. *Trombetta*, 467 U. S. 479, 488, n. 8 (1984). An interpretation of *Brady* to create a broad, constitutionally required right of discovery "would entirely alter the character and balance of our present systems of criminal justice." *Giles* v. *Maryland*, 386 U. S. 66, 117 (1967) (dissenting opinion). Furthermore, a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments.

sure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." 427 U. S., at 108.

In *Brady* and *Agurs*, the prosecutor failed to disclose exculpatory evidence. In the present case, the prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest. Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio* v. *United States*, 405 U. S. 150, 154 (1972). Such evidence is "evidence favorable to an accused," *Brady*, 373 U. S., at 87, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue* v. *Illinois*, 360 U. S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

The Court of Appeals treated impeachment evidence as constitutionally different from exculpatory evidence. According to that court, failure to disclose impeachment evidence is "even more egregious" than failure to disclose exculpatory evidence "because it threatens the defendant's right to confront adverse witnesses." 719 F. 2d, at 1464. Relying on *Davis* v. *Alaska*, 415 U. S. 308 (1974), the Court of Appeals held that the Government's failure to disclose requested impeachment evidence that the defense could use to conduct an effective cross-examination of important prosecution witnesses constitutues "'constitutional error of the first magnitude'" requiring automatic reversal. 719 F. 2d, at 1464 (quoting *Davis* v. *Alaska, supra,* at 318).

This Court has rejected any such distinction between impeachment evidence and exculpatory evidence. In *Giglio* v. *United States, supra,* the Government failed to disclose impeachment evidence similar to the evidence at issue in the present case, that is, a promise made to the key Government

witness that he would not be prosecuted if he testified for the Government. This Court said:

> "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e] general rule [of *Brady*]. We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .' A finding of materiality of the evidence is required under *Brady*. . . . A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" 405 U. S., at 154 (citations omitted).

Thus, the Court of Appeals' holding is inconsistent with our precedents.

Moreover, the court's reliance on *Davis* v. *Alaska* for its "automatic reversal" rule is misplaced. In *Davis*, the defense sought to cross-examine a crucial prosecution witness concerning his probationary status as a juvenile delinquent. The defense intended by this cross-examination to show that the witness might have made a faulty identification of the defendant in order to shift suspicion away from himself or because he feared that his probationary status would be jeopardized if he did not satisfactorily assist the police and prosecutor in obtaining a conviction. Pursuant to a state rule of procedure and a state statute making juvenile adjudications inadmissible, the trial judge prohibited the defense from conducting the cross-examination. This Court reversed the defendant's conviction, ruling that the direct restriction on the scope of cross-examination denied the defendant "the right of effective cross-examination which '"would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Brookhart* v. *Janis*, 384 U. S. 1, 3.'" 415 U. S., at 318 (quoting *Smith*

v. *Illinois*, 390 U. S. 129, 131 (1968)). See also *United States* v. *Cronic*, 466 U. S. 648, 659 (1984).

The present case, in contrast, does not involve any direct restriction on the scope of cross-examination. The defense was free to cross-examine the witnesses on any relevant subject, including possible bias or interest resulting from inducements made by the Government. The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. As discussed above, such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt," *United States* v. *Agurs*, 427 U. S., at 112, a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

## III

### A

It remains to determine the standard of materiality applicable to the nondisclosed evidence at issue in this case. Our starting point is the framework for evaluating the materiality of *Brady* evidence established in *United States* v. *Agurs*. The Court in *Agurs* distinguished three situations involving the discovery, after trial, of information favorable to the accused that had been known to the prosecution but unknown to the defense. The first situation was the prosecutor's knowing use of perjured testimony or, equivalently, the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false. The Court noted the well-established rule that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

427 U. S., at 103 (footnote omitted).[8]   Although this rule is stated in terms that treat the knowing use of perjured testimony as error subject to harmless-error review,[9] it may as

---

[8] In fact, the *Brady* rule has its roots in a series of cases dealing with convictions based on the prosecution's knowing use of perjured testimony. In *Mooney* v. *Holohan*, 294 U. S. 103 (1935), the Court established the rule that the knowing use by a state prosecutor of perjured testimony to obtain a conviction and the deliberate suppression of evidence that would have impeached and refuted the testimony constitutes a denial of due process. The Court reasoned that "a deliberate deception of court and jury by the presentation of testimony known to be perjured" is inconsistent with "the rudimentary demands of justice." *Id.*, at 112.   The Court reaffirmed this principle in broader terms in *Pyle* v. *Kansas*, 317 U. S. 213 (1942), where it held that allegations that the prosecutor had deliberately suppressed evidence favorable to the accused and had knowingly used perjured testimony were sufficient to charge a due process violation.

The Court again reaffirmed this principle in *Napue* v. *Illinois*, 360 U. S. 264 (1959).   In *Napue*, the principal witness for the prosecution falsely testified that he had been promised no consideration for his testimony.   The Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared. The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction—even false testimony that goes only to the credibility of the witness—is "implicit in any concept of ordered liberty." *Id.*, at 269.   Finally, the Court held that it was not bound by the state court's determination that the false testimony "could not in any reasonable likelihood have affected the judgment of the jury." *Id.*, at 271. The Court conducted its own independent examination of the record and concluded that the false testimony "may have had an effect on the outcome of the trial." *Id.*, at 272.   Accordingly, the Court reversed the judgment of conviction.

[9] The rule that a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict derives from *Napue* v. *Illinois*, 360 U. S., at 271.   See n. 8, *supra*.   See also *Giglio* v. *United States*, 405 U. S. 150, 154 (1972) (quoting *Napue*, 360 U. S., at 271). *Napue* antedated *Chapman* v. *California*, 386 U. S. 18 (1967), where the "harmless beyond a reasonable doubt" standard was established.   The Court in *Chapman* noted that there was little, if any, difference between

easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt. The Court in *Agurs* justified this standard of materiality on the ground that the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves "a corruption of the truth-seeking function of the trial process." *Id.*, at 104.

At the other extreme is the situation in *Agurs* itself, where the defendant does not make a *Brady* request and the prosecutor fails to disclose certain evidence favorable to the accused. The Court rejected a harmless-error rule in that situation, because under that rule every nondisclosure is treated as error, thus imposing on the prosecutor a constitutional duty to deliver his entire file to defense counsel.[10] 427 U. S., at 111–112. At the same time, the Court rejected a standard that would require the defendant to demonstrate that the evidence if disclosed probably would have resulted in acquittal. *Id.*, at 111. The Court reasoned: "If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice." *Ibid.* The

---

a rule formulated, as in *Napue,* in terms of " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction,' " and a rule " 'requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " 386 U. S., at 24 (quoting *Fahy* v. *Connecticut,* 375 U. S. 85, 86–87 (1963)). It is therefore clear, as indeed the Government concedes, see Brief for United States 20, and 36–38, that this Court's precedents indicate that the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard.

[10] This is true only if the nondisclosure is treated as error subject to harmless-error review, and not if the nondisclosure is treated as error only if the evidence is material under a not "harmless beyond a reasonable doubt" standard.

standard of materiality applicable in the absence of a specific
*Brady* request is therefore stricter than the harmless-error
standard but more lenient to the defense than the newly-
discovered-evidence standard.

The third situation identified by the Court in *Agurs* is
where the defense makes a specific request and the prosecu-
tor fails to disclose responsive evidence.[11]  The Court did not
define the standard of materiality applicable in this situa-
tion,[12] but suggested that the standard might be more lenient
to the defense than in the situation in which the defense
makes no request or only a general request.  427 U. S., at
106.  The Court also noted: "When the prosecutor receives
a specific and relevant request, the failure to make any re-
sponse is seldom, if ever, excusable." *Ibid.*

The Court has relied on and reformulated the *Agurs* stand-
ard for the materiality of undisclosed evidence in two subse-
quent cases arising outside the *Brady* context.  In neither
case did the Court's discussion of the *Agurs* standard distin-
guish among the three situations described in *Agurs*.  In
*United States* v. *Valenzuela-Bernal*, 458 U. S. 858, 874
(1982), the Court held that due process is violated when testi-
mony is made unavailable to the defense by Government de-
portation of witnesses "only if there is a reasonable likelihood
that the testimony could have affected the judgment of the

---

[11] The Court in *Agurs* identified *Brady* as a case in which specific in-
formation was requested by the defense.  427 U. S., at 106.  The request
in *Brady* was for the extrajudicial statements of Brady's accomplice.  See
373 U. S., at 84.

[12] The Court in *Agurs* noted: "A fair analysis of the holding in *Brady* indi-
cates that implicit in the requirement of materiality is a concern that the
suppressed evidence might have affected the outcome of the trial."  427
U. S., at 104.  Since the *Agurs* Court identified *Brady* as a "specific re-
quest" case, see n. 11, *supra*, this language might be taken as indicating
the standard of materiality applicable in such a case.  It is clear, however,
that the language merely explains the meaning of the term "materiality."
It does not establish a standard of materiality because it does not indicate
what quantum of likelihood there must be that the undisclosed evidence
would have affected the outcome.

trier of fact." And in *Strickland* v. *Washington*, 466 U. S. 668 (1984), the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694.[13] The *Strickland* Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Ibid.*

We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

The Government suggests that a materiality standard more favorable to the defendant reasonably might be adopted in specific request cases. See Brief for United States 31. The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued. *Ibid.*

We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the

---

[13] In particular, the Court explained in *Strickland:* "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." 466 U. S., at 695.

nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. This possibility of impairment does not necessitate a different standard of materiality, however, for under the *Strickland* formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

## B

In the present case, we think that there is a significant likelihood that the prosecutor's response to respondent's discovery motion misleadingly induced defense counsel to believe that O'Connor and Mitchell could not be impeached on the basis of bias or interest arising from inducements offered by the Government. Defense counsel asked the prosecutor to disclose any inducements that had been made to witnesses, and the prosecutor failed to disclose that the possibility of a reward had been held out to O'Connor and Mitchell if the information they supplied led to "the accomplishment of the objective sought to be obtained . . . to the satisfaction of [the Government]." App. 22 and 23. This possibility of a reward gave O'Connor and Mitchell a direct, personal stake in respondent's conviction. The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction. Moreover, the prosecutor disclosed affidavits that stated that O'Connor and Mitchell received no promises of reward in return for providing information in the affidavits implicating respondent in

criminal activity. In fact, O'Connor and Mitchell signed the last of these affidavits the very day after they signed the ATF contracts. While the Government is technically correct that the blank contracts did not constitute a "promise of reward," the natural effect of these affidavits would be misleadingly to induce defense counsel to believe that O'Connor and Mitchell provided the information in the affidavits, and ultimately their testimony at trial recounting the same information, without any "inducements."

The District Court, nonetheless, found beyond a reasonable doubt that, had the information that the Government held out the possibility of reward to its witnesses been disclosed, the result of the criminal prosecution would not have been different. If this finding were sustained by the Court of Appeals, the information would be immaterial even under the standard of materiality applicable to the prosecutor's knowing use of perjured testimony. Although the express holding of the Court of Appeals was that the nondisclosure in this case required automatic reversal, the Court of Appeals also stated that it "disagreed" with the District Court's finding of harmless error. In particular, the Court of Appeals appears to have disagreed with the factual premise on which this finding expressly was based. The District Court reasoned that O'Connor's and Mitchell's testimony was exculpatory on the narcotics charges. The Court of Appeals, however, concluded, after reviewing the record, that O'Connor's and Mitchell's testimony was in fact inculpatory on those charges. 719 F. 2d, at 1464, n. 1. Accordingly, we reverse the judgment of the Court of Appeals and remand the case to that court for a determination whether there is a reasonable probability that, had the inducement offered by the Government to O'Connor and Mitchell been disclosed to the defense, the result of the trial would have been different.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in part and concurring in the judgment.

I agree with the Court that respondent is not entitled to have his conviction overturned unless he can show that the evidence withheld by the Government was "material," and I therefore join Parts I and II of the Court's opinion.  I also agree with JUSTICE BLACKMUN that for purposes of this inquiry, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Ante*, at 682.  As the Justice correctly observes, this standard is "sufficiently flexible" to cover all instances of prosecutorial failure to disclose evidence favorable to the accused.  *Ibid.*  Given the flexibility of the standard and the inherently fact-bound nature of the cases to which it will be applied, however, I see no reason to attempt to elaborate on the relevance to the inquiry of the specificity of the defense's request for disclosure, either generally or with respect to this case.  I would hold simply that the proper standard is one of reasonable probability and that the Court of Appeals' failure to apply this standard necessitates reversal.  I therefore concur in the judgment.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

When the Government withholds from a defendant evidence that might impeach the prosecution's *only witnesses*, that failure to disclose cannot be deemed harmless error. Because that is precisely the nature of the undisclosed evidence in this case, I would affirm the judgment of the Court of Appeals and would not remand for further proceedings.

I

The federal grand jury indicted the respondent, Hughes Anderson Bagley, on charges involving possession of fire-

arms and controlled substances with intent to distribute. Following a bench trial, Bagley was found not guilty of the firearms charges, guilty of two counts of knowingly and intentionally distributing Valium, and guilty of several counts of a lesser included offense of possession of controlled substances. He was sentenced to six months' imprisonment and a special parole term of five years on the first count of distribution, and to three years of imprisonment, which were suspended, and five years' probation, on the second distribution count. He received a suspended sentence and five years' probation for the possession convictions.

The record plainly demonstrates that on the two counts for which Bagley received sentences of imprisonment, the Government's entire case hinged on the testimony of two private security guards who aided the Bureau of Alcohol, Tobacco and Firearms (ATF) in its investigation of Bagley. In 1977 the two guards, O'Connor and Mitchell, worked for the Milwaukee Railroad; for about three years, they had been social acquaintances of Bagley, with whom they often shared coffee breaks. 7 Tr. 2–3; 8 Tr. 2a–3a. At trial, they testified that on two separate occasions they had visited Bagley at his home, where Bagley had responded to O'Connor's complaint that he was extremely anxious by giving him Valium pills. In total, Bagley received $8 from O'Connor, representing the cost of the pills. At trial, Bagley testified that he had a prescription for the Valium because he suffered from a bad back, 14 Tr. 963–964. No testimony to the contrary was introduced. O'Connor and Mitchell each testified that they had worn concealed transmitters and body recorders at these meetings, but the tape recordings were insufficiently clear to be admitted at trial and corroborate their testimony.

Before trial, counsel for Bagley had filed a detailed discovery motion requesting, among other things, "any deals, promises or inducements made to witnesses in exchange for their testimony." App. 17–19. In response to the discovery request, the Government had provided affidavits sworn by

O'Connor and Mitchell that had been prepared during their investigation of Bagley. Each affidavit recounted in detail the dealings the witnesses had had with Bagley and closed with the declaration, "I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it." Brief for United States 3, quoting Memorandum of Points and Authorities in Support of Pet. for Habeas Corpus, CV80–3592–RJK(M) (CD Cal.) Exhibits 1–9. Both of these agents testified at trial thereafter, and the Government did not disclose the existence of any deals, promises, or inducements. Counsel for Bagley asked O'Connor on cross-examination whether he was testifying in response to pressure or threats from the Government about his job, and O'Connor said he was not. 7 Tr. 89–90. In light of the affidavits, as well as the prosecutor's silence as to the existence of any promises, deals, or inducements, counsel did not pursue the issue of bias of either guard.

As it turns out, however, in May 1977, seven months prior to trial, O'Connor and Mitchell each had signed an agreement providing that ATF would pay them for information they provided. The form was entitled "Contract for Purchase of Information and Payment of Lump Sum Therefor," and provided that the Bureau would, "upon the accomplishment of the objective sought to be obtained . . . pay to said vendor a sum commensurate with services and information rendered." App. 22–23. It further invited the Bureau's special agent in charge of the investigation, Agent Prins, to recommend an amount to be paid after the information received had proved "worthy of compensation." Agent Prins had personally presented these forms to O'Connor and Mitchell for their signatures. The two witnesses signed the last of their affidavits, which declared the absence of any promise of reward, *the day after they signed the ATF forms.* After trial, Agent Prins requested that O'Connor and Mitchell each be paid $500, but the Bureau reduced these "rewards" to $300 each. App. to

Pet. for Cert. 14a. The District Court Judge concluded that "it appears probable to the Court that O'Connor and Mitchell did expect to receive from the United States some kind of compensation, over and above their expenses, for their assistance, though perhaps not for their testimony." *Id.*, at 7a.

Upon discovering these ATF forms through a Freedom of Information Act request, Bagley sought relief from his conviction. The District Court Judge denied Bagley's motion to vacate his sentence stating that because he was the same judge who had been the original trier of fact, he was able to determine the effect the contracts would have had on his decision, more than four years earlier, to convict Bagley. The judge stated that beyond a reasonable doubt the contracts, if disclosed, would have had no effect upon the convictions:

"The Court has read in their entirety the transcripts of the testimony of James P. O'Connor and Donald E. Mitchell at the trial . . . . Almost all of the testimony of both of those witnesses was devoted to the firearm charges in the indictment. The Court found the defendant not guilty of those charges. With respect to the charges against the defendant of distributing controlled substances and possessing controlled substances with the intention of distributing them, the testimony of O'Connor and Mitchell was relatively very brief. With respect to the charges relating to controlled substances cross-examination of those witnesses by defendant's counsel did not seek to discredit their testimony as to the facts of distribution but rather sought to show that the controlled substances in question came from supplies which had been prescribed for defendant's own use. As to that aspect of their testimony, the testimony of O'Connor and Mitchell tended to be favorable to the defendant." *Id.*, at 8a.

The foregoing statement, as to which the Court remands for further consideration, is seriously flawed on its face. First, the testimony that the court describes was in fact the *only inculpatory testimony in the case* as to the two counts for which Bagley received a sentence of imprisonment. If, as the judge claimed, the testimony of the two information "vendors" was "very brief" and in part favorable to the defendant, that fact shows the weakness of the prosecutor's case, not the harmlessness of the error. If the testimony that might have been impeached is weak and also cumulative, corroborative, or tangential, the failure to disclose the impeachment evidence could conceivably be held harmless. But when the testimony is the start and finish of the prosecution's case, and is weak nonetheless, quite a different conclusion must necessarily be drawn.

Second, the court's statement that Bagley did not attempt to discredit the witnesses' testimony, as if to suggest that impeachment evidence would not have been used by the defense, ignores the realities of trial preparation and strategy, and is factually erroneous as well. Initially, the Government's failure to disclose the existence of any inducements to its witnesses, coupled with its disclosure of affidavits stating that no promises had been made, would lead all but the most careless lawyer to step wide and clear of questions about promises or inducements. The combination of nondisclosure and disclosure would simply lead any reasonable attorney to believe that the witness could not be impeached on that basis. Thus, a firm avowal that no payment is being received in return for assistance and testimony, if offered at trial by a witness who is not even a Government employee, could be devastating to the defense. A wise attorney would, of necessity, seek an alternative defense strategy.

Moreover, counsel for Bagley in fact did attempt to discredit O'Connor, by asking him whether two ATF agents had pressured him or had threatened that his job might be in

jeopardy, in order to get him to cooperate. 7 Tr. 89–90. But when O'Connor answered in the negative, *ibid.*, counsel stopped this line of questioning. In addition, counsel for Bagley attempted to argue to the District Court, in his closing argument, that O'Connor and Mitchell had "fabricated" their accounts, 14 Tr. 1117, but the court rejected the proposition:

> "Let me say this to you. I would find it hard to believe really that their testimony was fabricated. I think they might have been mistaken. You know, it is possible that they were mistaken. *I really did not get the impression at all that either one or both of those men were trying at least in court here to make a case against the defendant.*" *Id.*, at 1117–1118. (Emphasis added.)

The District Court, in so saying, of course had seen no evidence to suggest that the two witnesses might have any motive for "mak[ing] a case" against Bagley. Yet, as JUSTICE BLACKMUN points out, the possibility of a reward, the size of which is directly related to the Government's success at trial, gave the two witnesses a "personal stake" in the conviction and an "incentive to testify falsely in order to secure a conviction." *Ante,* at 683.

Nor is this case unique. Whenever the Government fails, in response to a request, to disclose impeachment evidence relating to the credibility of its key witnesses, the truth-finding process of trial is necessarily thrown askew. The failure to disclose evidence affecting the overall credibility of witnesses corrupts the process to some degree in all instances, see *Giglio* v. *United States,* 405 U. S. 150 (1972); *Napue* v. *Illinois,* 360 U. S. 264 (1959); *United States* v. *Agurs,* 427 U. S. 97, 121 (1976) (MARSHALL, J., dissenting), but when "the 'reliability of a given witness may well be determinative of guilt or innocence,'" *Giglio, supra,* at 154 (quoting *Napue, supra,* at 269), and when "the Government's case depend[s] almost entirely on" the testimony of a certain witness, 405 U. S., at 154, evidence of that witness' possible

bias simply may not be said to be irrelevant, or its omission harmless. As THE CHIEF JUSTICE said in *Giglio* v. *United States*, in which the Court ordered a new trial in a case in which a promise to a key witness was not disclosed to the jury:

> "[W]ithout [Taliento's testimony] there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.
>
> "For these reasons, the due process requirements enunciated in *Napue* and other cases cited earlier require a new trial." *Id.*, at 154–155.

Here, too, witnesses O'Connor and Mitchell were crucial to the Government's case. Here, too, their personal credibility was potentially dispositive, particularly since the allegedly corroborating tape recordings were not audible. It simply cannot be denied that the existence of a contract signed by those witnesses, promising a reward whose size would depend "on the Government's satisfaction with the end result," *ante*, at 683, might sway the trier of fact, or cast doubt on the truth of all that the witnesses allege. In such a case, the trier of fact is absolutely entitled to know of the contract, and the defense counsel is absolutely entitled to develop his case with an awareness of it. Whatever the applicable standard of materiality, see *infra*, in this instance it undoubtedly is well met.

Indeed, *Giglio* essentially compels this result. The similarities between this case and that one are evident. In both cases, the triers of fact were left unaware of Government inducements to key witnesses. In both cases, the individual trial prosecutors acted in good faith when they failed to disclose the exculpatory evidence. See *Giglio, supra*, at 151–153; App. to Pet. for Cert. 13a (Magistrate's finding that

Bagley prosecutor would have disclosed information had he known of it). The sole difference between the two cases lies in the fact that in *Giglio*, the prosecutor affirmatively stated *to the trier of fact* that no promises had been made. Here, silence in response to a defense request took the place of an affirmative error at trial—although the prosecutor did make an affirmative misrepresentation to the defense in the affidavits. Thus, in each case, the trier of fact was left unaware of powerful reasons to question the credibility of the witnesses. "[T]he truth-seeking process is corrupted by the withholding of evidence favorable to the defense, regardless of whether the evidence is directly contradictory to evidence offered by the prosecution." *Agurs, supra,* at 120 (MARSHALL, J., dissenting). In this case, as in *Giglio*, a new trial is in order, and the Court of Appeals correctly reversed the District Court's denial of such relief.

## II

Instead of affirming, the Court today chooses to reverse and remand the case for application of its newly stated standard to the facts of this case. While I believe that the evidence at issue here, which remained undisclosed despite a particular request, undoubtedly was material under the Court's standard, I also have serious doubts whether the Court's definition of the constitutional right at issue adequately takes account of the interests this Court sought to protect in its decision in *Brady* v. *Maryland,* 373 U. S. 83 (1963).

## A

I begin from the fundamental premise, which hardly bears repeating, that "[t]he purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one." *Application of Kapatos,* 208 F. Supp. 883, 888 (SDNY 1962); see *Giles* v. *Maryland,* 386 U. S. 66, 98 (1967) (Fortas, J., concurring in judgment) ("The State's obligation is not to convict, but to see that, so far as possible, truth emerges"). When evidence favorable to the defendant is known to exist,

disclosure only enhances the quest for truth; it takes no direct toll on that inquiry. Moreover, the existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty. The private whys and wherefores of jury deliberations pose an impenetrable barrier to our ability to know just which piece of information might make, or might have made, a difference.

When the state does not disclose information in its possession that might reasonably be considered favorable to the defense, it precludes the trier of fact from gaining access to such information and thereby undermines the reliability of the verdict. Unlike a situation in which exculpatory evidence exists but neither the defense nor the prosecutor has uncovered it, in this situation the state already has, resting in its files, material that would be of assistance to the defendant. With a minimum of effort, the state could improve the real and apparent fairness of the trial enormously, by assuring that the defendant may place before the trier of fact favorable evidence known to the government. This proposition is not new. We have long recognized that, within the limit of the state's ability to identify so-called exculpatory information, the state's concern for a fair verdict precludes it from withholding from the defense evidence favorable to the defendant's case in the prosecutor's files. See, *e. g.*, *Pyle* v. *Kansas*, 317 U. S. 213, 215–216 (1942) (allegation that imprisonment resulted from perjured testimony and deliberate suppression by authorities of evidence favorable to him "charge a deprivation of rights guaranteed by the Federal Constitution").[1]

---

[1] As early as 1807, this Court made clear that prior to trial a defendant must have access to impeachment evidence in the Government's possession. Addressing defendant Aaron Burr's claim that he should have access to the letter of General Wilkinson, a key witness against Burr in his trial for treason, Chief Justice Marshall wrote:

"The application of that letter to the case is shown by the terms in which the communication was made. It is a statement of the conduct of the

This recognition no doubt stems in part from the frequently considerable imbalance in resources between most criminal defendants and most prosecutors' offices. Many, perhaps most, criminal defendants in the United States are represented by appointed counsel, who often are paid minimal wages and operate on shoestring budgets. In addition, unlike police, defense counsel generally is not present at the scene of the crime, or at the time of arrest, but instead comes into the case late. Moreover, unlike the government, defense counsel is not in the position to make deals with witnesses to gain evidence. Thus, an inexperienced, unskilled, or unaggressive attorney often is unable to amass the factual support necessary to a reasonable defense. When favorable evidence is in the hands of the prosecutor but not disclosed, the result may well be that the defendant is deprived of a fair chance before the trier of fact, and the trier of fact is deprived of the ingredients necessary to a fair decision. This grim reality, of course, poses a direct challenge to the traditional model of the adversary criminal process,[2] and perhaps

accused made by the person who is declared to be the essential witness against him. The order for producing this letter is opposed:

"First, because it is not material to the defense. It is a principle, universally acknowledged, that a party has a right to oppose to the testimony of any witness against him, the declarations which that witness has made at other times on the same subject. If he possesses this right, he must bring forward proof of those declarations. This proof must be obtained before he knows positively what the witness will say; for if he waits until the witness has been heard at the trial, it is too late to meet him with his former declarations. Those former declarations, therefore, constitute a mass of testimony, which a party has a right to obtain by way of precaution, and the positive necessity of which can only be decided at the trial." *United States* v. *Burr*, 25 F. Cas. 30, 36 (No. 14,692d) (CC Va. 1807).

[2] See Fortas, The Fifth Amendment: Nemo Tenetur Prodere Seipsum, 25 Clev. B. A. J. 91, 98 (1954) ("The state and [the defendant] could meet, as the law contemplates, in adversary trial, as equals—strength against strength, resource against resource, argument against argument"); see also Babcock, Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel, 34 Stan. L. Rev. 1133, 1142–1145 (1982) (discussing challenge *Brady* poses to traditional adversary model).

because this reality so directly questions the fairness of our longstanding processes, change has been cautious and halting. Thus, the Court has not gone the full road and expressly required that the state provide to the defendant access to the prosecutor's complete files, or investigators who will assure that the defendant has an opportunity to discover every existing piece of helpful evidence. But cf. *Ake* v. *Oklahoma*, 470 U. S. 68 (1985) (access to assistance of psychiatrist constitutionally required on proper showing of need). Instead, in acknowledgment of the fact that important interests are served when potentially favorable evidence is disclosed, the Court has fashioned a compromise, requiring that the prosecution identify and disclose to the defendant favorable material that it possesses. This requirement is but a small, albeit important, step toward equality of justice.[3]

## B

*Brady* v. *Maryland*, 373 U. S. 83 (1963), of course, established this requirement of disclosure as a fundamental element of a fair trial by holding that a defendant was denied due process if he was not given access to favorable evidence that is material either to guilt or punishment. Since *Brady* was decided, this Court has struggled, in a series of decisions, to define how best to effectuate the right recognized. To my mind, the *Brady* decision, the reasoning that underlay it, and the fundamental interest in a fair trial, combine to give the criminal defendant the right to receive from the prosecutor, and the prosecutor the affirmative duty to turn

---

[3] Indeed, this Court's recent decision stating a stringent standard for demonstrating ineffective assistance of counsel makes an effective *Brady* right even more crucial. Without a real guarantee of effective counsel, the relative abilities of the state and the defendant become even more skewed, and the need for a minimal guarantee of access to potentially favorable information becomes significantly greater. See *Strickland* v. *Washington*, 466 U. S. 668 (1984); *id.*, at 712–715 (MARSHALL, J., dissenting); Babcock, *supra*, at 1163–1174 (discussing the interplay between the right to *Brady* material and the right to effective assistance of counsel).

over to the defendant, *all* information known to the government that might reasonably be considered favorable to the defendant's case. Formulation of this right, and imposition of this duty, are "the essence of due process of law. It is the State that tries a man, and it is the State that must insure that the trial is fair." *Moore* v. *Illinois,* 408 U. S. 786, 809–810 (1972) (MARSHALL, J., concurring in part and dissenting in part). If that right is denied, or if that duty is shirked, however, I believe a reviewing court should not automatically reverse but instead should apply the harmless-error test the Court has developed for instances of error affecting constitutional rights. See *Chapman* v. *California,* 386 U. S. 18 (1967).

My view is based in significant part on the reality of criminal practice and on the consequently inadequate protection to the defendant that a different rule would offer. To implement *Brady,* courts must of course work within the confines of the criminal process. Our system of criminal justice is animated by two seemingly incompatible notions: the adversary model, and the state's primary concern with justice, not convictions. *Brady,* of course, reflects the latter goal of justice, and is in some ways at odds with the competing model of a sporting event. Our goal, then, must be to integrate the *Brady* right into the harsh, daily reality of this apparently discordant criminal process.

At the trial level, the duty of the state to effectuate *Brady* devolves into the duty of the prosecutor; the dual role that the prosecutor must play poses a serious obstacle to implementing *Brady.* The prosecutor is by trade, if not necessity, a zealous advocate. He is a trained attorney who must aggressively seek convictions in court on behalf of a victimized public. At the same time, as a representative of the state, he must place foremost in his hierarchy of interests the determination of truth. Thus, for purposes of *Brady,* the prosecutor must abandon his role as an advocate and pore through his files, as objectively as possible, to identify the

material that could undermine his case. Given this obviously unharmonious role, it is not surprising that these advocates oftentimes overlook or downplay potentially favorable evidence, often in cases in which there is no doubt that the failure to disclose was a result of absolute good faith. Indeed, one need only think of the Fourth Amendment's requirement of a neutral intermediary, who tests the strength of the policeman-advocate's facts, to recognize the curious status *Brady* imposes on a prosecutor. One telling example, offered by Judge Newman when he was a United States Attorney, suffices:

> "I recently had occasion to discuss *[Brady]* at a PLI Conference in New York City before a large group of State prosecutors. . . . I put to them this case: You are prosecuting a bank robbery. You have talked to two or three of the tellers and one or two of the customers at the time of the robbery. They have all taken a look at your defendant in a line-up, and they have said, 'This is the man.' In the course of your investigation you also have found another customer who was in the bank that day, who viewed the suspect, and came back and said, 'This is *not* the man.'
>
> "The question I put to these prosecutors was, do you believe you should disclose to the defense the name of the witness who, when he viewed the suspect, said 'that is not the man'? In a room of prosecutors not quite as large as this group but almost as large, only two hands went up. There were only two prosecutors in that group who felt they should disclose or would disclose that information. Yet I was putting to them what I thought was the easiest case—the clearest case for disclosure of exculpatory information!" J. Newman, A Panel Discussion before the Judicial Conference of the Second Judicial Circuit (Sept. 8, 1967), reprinted in Discovery in Criminal Cases, 44 F. R. D. 481, 500–501 (1968) (hereafter Newman).

While familiarity with *Brady* no doubt has increased since 1967, the dual role that the prosecutor must play, and the very real pressures that role creates, have not changed.

The prosecutor surely greets the moment at which he must turn over *Brady* material with little enthusiasm. In perusing his files, he must make the often difficult decision as to whether evidence is favorable, and must decide on which side to err when faced with doubt. In his role as advocate, the answers are clear. In his role as representative of the state, the answers should be equally clear, and often to the contrary. Evidence that is of doubtful worth in the eyes of the prosecutor could be of inestimable value to the defense, and might make the difference to the trier of fact.

Once the prosecutor suspects that certain information might have favorable implications for the defense, either because it is potentially exculpatory or relevant to credibility, I see no reason why he should not be required to disclose it. After all, favorable evidence indisputably enhances the truth-seeking process at trial. And it is the job of the defense, not the prosecution, to decide whether and in what way to use arguably favorable evidence. In addition, to require disclosure of all evidence that might reasonably be considered favorable to the defendant would have the precautionary effect of assuring that no information of potential consequence is mistakenly overlooked. By requiring full disclosure of favorable evidence in this way, courts could begin to assure that a possibly dispositive piece of information is not withheld from the trier of fact by a prosecutor who is torn between the two roles he must play. A clear rule of this kind, coupled with a presumption in favor of disclosure, also would facilitate the prosecutor's admittedly difficult task by removing a substantial amount of unguided discretion.

If a trial will thereby be more just, due process would seem to require such a rule absent a countervailing interest. I see little reason for the government to keep such information

from the defendant. Its interest in nondisclosure at the trial stage is at best slight: the government apparently seeks to avoid the administrative hassle of disclosure, and to prevent disclosure of inculpatory evidence that might result in witness intimidation and manufactured rebuttal evidence.[4] Neither of these concerns, however, counsels in favor of a rule of nondisclosure in close or ambiguous cases. To the contrary, a rule simplifying the disclosure decision by definition does not make that decision more complex. Nor does disclosure of favorable evidence inevitably lead to disclosure of inculpatory evidence, as might an open file policy, or to the anticipated wrongdoings of defendants and their lawyers, if indeed such fears are warranted. We have other mechanisms for disciplining unscrupulous defense counsel; hamstringing their clients need not be one of them. I simply do not find any state interest that warrants withholding from a presumptively innocent defendant, whose liberty is at stake in the proceeding, information that bears on his case and that might enable him to defend himself.

Under the foregoing analysis, the prosecutor's duty is quite straightforward: he must divulge all evidence that reasonably appears favorable to the defendant, erring on the side of disclosure.

## C

The Court, however, offers a complex alternative. It defines the right not by reference to the possible usefulness of the particular evidence in preparing and presenting the case, but retrospectively, by reference to the likely effect the evidence will have on the outcome of the trial. Thus, the Court holds that due process does not require the prosecutor to turn over evidence unless the evidence is "material," and the

---

[4] See Newman, 44 F. R. D., at 499 (describing the "serious" problem of witness intimidation that arises from prosecutor's disclosure of witnesses). But see Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?, 1963 Wash. U. L. Q. 279, 289–290 (disputing a similar argument).

Court states that evidence is "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ante*, at 682. Although this looks like a post-trial standard of review, see, *e. g.*, *Strickland* v. *Washington*, 466 U. S. 668 (1984) (adopting this standard of review), it is not. Instead, the Court relies on this review standard to define the contours of the defendant's constitutional right to certain material prior to trial. By adhering to the view articulated in *United States* v. *Agurs*, 427 U. S. 97 (1976)—that there is no constitutional duty to disclose evidence unless nondisclosure would have a certain impact on the trial—the Court permits prosecutors to withhold with impunity large amounts of undeniably favorable evidence, and it imposes on prosecutors the burden to identify and disclose evidence pursuant to a pretrial standard that virtually defies definition.

The standard for disclosure that the Court articulates today enables prosecutors to avoid disclosing obviously exculpatory evidence while acting well within the bounds of their constitutional obligation. Numerous lower court cases provide examples of evidence that is undoubtedly favorable but not necessarily "material" under the Court's definition, and that consequently would not have to be disclosed to the defendant under the Court's view. See, *e. g.*, *United States* v. *Sperling*, 726 F. 2d 69, 71–72 (CA2 1984) (prior statement disclosing motive of key Government witness to testify), cert. denied, 467 U. S. 1243 (1984); *King* v. *Ponte*, 717 F. 2d 635 (CA1 1983) (prior inconsistent statements of Government witness); see also *United States* v. *Oxman*, 740 F. 2d 1298, 1311 (CA3 1984) (addressing "disturbing" prosecutorial tendency to withhold information because of later opportunity to argue, with the benefit of hindsight, that information was not "material"), cert. pending *sub nom. United States* v. *Pflaumer*, No. 84–1033. The result is to veer sharply away from the basic notion that the fairness of a trial increases

with the amount of existing favorable evidence to which the defendant has access, and to disavow the ideal of full disclosure.

The Court's definition poses other, serious problems. Besides legitimizing the nondisclosure of clearly favorable evidence, the standard set out by the Court also asks the prosecutor to predict what effect various pieces of evidence will have on the trial. He must evaluate his case and the case of the defendant—of which he presumably knows very little—and perform the impossible task of deciding whether a certain piece of information will have a significant impact on the trial, bearing in mind that a defendant will later shoulder the heavy burden of proving how it would have affected the outcome. At best, this standard places on the prosecutor a responsibility to speculate, at times without foundation, since the prosecutor will not normally know what strategy the defense will pursue or what evidence the defense will find useful. At worst, the standard invites a prosecutor, whose interests are conflicting, to gamble, to play the odds, and to take a chance that evidence will later turn out not to have been potentially dispositive. One Court of Appeals has recently vented its frustration at these unfortunate consequences:

> "It seems clear that those tests [for materiality] have a tendency to encourage unilateral decision-making by prosecutors with respect to disclosure. . . . [T]he root of the problem is the prosecutor's tendency to adopt a retrospective view of materiality. Before trial, the prosecutor cannot know whether, after trial, particular evidence will prove to have been material. . . . Following their adversarial instincts, some prosecutors have determined unilaterally that evidence will not be material and, often in good faith, have disclosed it neither to defense counsel nor to the court. If and when the evidence emerges after trial, the prosecutor can always argue,

with the benefit of hindsight, that it was not material."
*United States* v. *Oxman, supra,* at 1310.

The Court's standard also encourages the prosecutor to assume the role of the jury, and to decide whether certain evidence will make a difference. In our system of justice, that decision properly and wholly belongs to the jury. The prosecutor, convinced of the guilt of the defendant and of the truthfulness of his witnesses, may all too easily view as irrelevant or unpersuasive evidence that draws his own judgments into question. Accordingly he will decide the evidence need not be disclosed. But the ideally neutral trier of fact, who approaches the case from a wholly different perspective, is by the prosecutor's decision denied the opportunity to consider the evidence. The reviewing court, faced with a verdict of guilty, evidence to support that verdict, and pressures, again understandable, to finalize criminal judgments, is in little better position to review the withheld evidence than the prosecutor.

I simply cannot agree with the Court that the due process right to favorable evidence recognized in *Brady* was intended to become entangled in prosecutorial determinations of the likelihood that particular information would affect the outcome of trial. Almost a decade of lower court practice with *Agurs* convinces me that courts and prosecutors have come to pay "too much deference to the federal common law policy of discouraging discovery in criminal cases, and too little regard to due process of law for defendants." *United States* v. *Oxman, supra,* at 1310–1311. Apparently anxious to assure that reversals are handed out sparingly, the Court has defined a rigorous test of materiality. Eager to apply the "materiality" standard at the pretrial stage, as the Court permits them to do, prosecutors lose sight of the basic principles underlying the doctrine. I would return to the original theory and promise of *Brady* and reassert the duty of the prosecutor to disclose all evidence in his files that might reasonably be considered favorable to the defendant's case. No

prosecutor can know prior to trial whether such evidence *will* be of consequence at trial; the mere fact that it might be, however, suffices to mandate disclosure.[5]

---

[5] *Brady* not only stated the rule that suppression by the prosecution of evidence favorable to the defendant "violates due process where the evidence is material either to guilt or to punishment," 373 U. S., at 87, but also observed that two decisions of the Court of Appeals for the Third Circuit "state the correct constitutional rule." *Id.*, at 86. Neither of those decisions limited the right only to evidence that is "material" within the meaning that the Court today articulates. Instead, they provide strong evidence that *Brady* might have used the word in its evidentiary sense, to mean, essentially, germane to the points at issue.

In *United States ex rel. Almeida* v. *Baldi,* 195 F. 2d 815 (CA3 1952), cert. denied, 345 U. S. 904 (1953), the appeals court granted a petition for habeas corpus in a case in which the State had withheld from the defendant evidence that might have mitigated his punishment. After describing the withheld evidence as "relevant" and "pertinent," 195 F. 2d, at 819, the court concluded: "We think that the conduct of the Commonwealth as outlined in the instant case is in conflict with our fundamental principles of liberty and justice. The suppression of evidence favorable to Almeida was a denial of due process." *Id.*, at 820. Similarly, in *United States ex rel. Thompson* v. *Dye,* 221 F. 2d 763, 765 (CA3), cert. denied, 350 U. S. 875 (1955), the District Court had denied a petition for habeas corpus after finding that certain evidence of defendant's drunkenness at the time of the offense in question was not "vital" to the defense and did not require disclosure. 123 F. Supp. 759, 762 (WD Pa. 1954). The Court of Appeals reversed, observing that whether or not the jury ultimately would credit the evidence at issue, the evidence was substantial and the State's failure to disclose it cannot "be held as a matter of law to be unimportant to the defense here." 221 F. 2d, at 767.

It is clear that the term "material" has an evidentiary meaning quite distinct from that which the Court attributes to it. Judge Weinstein, for example, defines as synonymous the words "ultimate fact," "operative fact," "material fact," and "consequential fact," each of which, he states, means "a 'fact that is of consequence to the determination of the action.'" 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 401[03], n. 1 (1982) (quoting Fed. Rule Evid. 401). Similarly, another treatise on evidence explains that there are two components to relevance—materiality and probative value. "Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue,

## D

In so saying, I recognize that a failure to divulge favorable information should not result in reversal in all cases. It may be that a conviction should be affirmed on appeal despite the prosecutor's failure to disclose evidence that reasonably might have been deemed potentially favorable prior to trial. The state's interest in nondisclosure at trial is minimal, and should therefore yield to the readily apparent benefit that full disclosure would convey to the search for truth. After trial, however, the benefits of disclosure may at times be tempered by the state's legitimate desire to avoid retrial when error has been harmless. However, in making the determination of harmlessness, I would apply our normal constitutional error test and reverse unless it is clear beyond a reasonable doubt that the withheld evidence would not have affected the outcome of the trial. See *Chapman* v. *California*, 386 U. S. 18 (1967); see also *Agurs*, 427 U. S., at 119–120 (MARSHALL, J., dissenting).[6]

---

the evidence is immaterial." E. Cleary, McCormick on Evidence § 185 (3d ed. 1984). "Probative value" addresses the tendency of the evidence to establish a "material" proposition. *Ibid.* See also 1 J. Wigmore, Evidence § 2 (P. Tillers rev. 1982). There is nothing in *Brady* to suggest that the Court intended anything other than a rule that favorable evidence need only relate to a proposition at issue in the case in order to merit disclosure.

Even if the Court did not use the term "material" simply to refer to favorable evidence that might be relevant, however, I still believe that due process requires that prosecutors have the duty to disclose all such evidence. The inherent difficulty in applying, prior to trial, a definition that relates to the outcome of the trial, and that is based on speculation and not knowledge, means that a considerable amount of potentially consequential material might slip through the Court's standard. Given the experience of the past decade with *Agurs*, and the practical problem that inevitably exists because the evidence must be disclosed prior to trial to be of any use, I can only conclude that all potentially favorable evidence must be disclosed. Of course, I agree with courts that have allowed exceptions to this rule on a showing of exigent circumstances based on security and law enforcement needs.

[6] In a case of deliberate prosecutorial misconduct, automatic reversal might well be proper. Certain kinds of constitutional error so infect the

Any rule other than automatic reversal, of course, dilutes the *Brady* right to some extent and offers the prosecutor an incentive not to turn over all information. In practical effect, it might be argued, there is little difference between the rule I propose—that a prosecutor must disclose all favorable evidence in his files, subject to harmless-error review—and the rule the Court adopts—that the prosecutor must disclose only the favorable information that might affect the outcome of the trial. According to this argument, if a constitutional right to all favorable evidence leads to reversal only when the withheld evidence might have affected the outcome of the trial, the result will be the same as with a constitutional right only to evidence that will affect the trial outcome. See Capra, Access to Exculpatory Evidence: Avoiding the *Agurs* Problems of Prosecutorial Discretion and Retrospective Review, 53 Ford. L. Rev. 391, 409–410, n. 117 (1984). For several reasons, however, I disagree. First, I have faith that a prosecutor would treat a rule requiring disclosure of all information of a certain kind differently from a rule requiring disclosure only of some of that information. Second, persistent or egregious failure to comply with the constitutional duty could lead to disciplinary actions by the courts. Third, the standard of harmlessness I adopt is more protective of the defendant than that chosen by the Court, placing the burden on the prosecutor, rather than the defendant, to prove the harmlessness of his actions. It would be a foolish prosecutor who gambled too glibly with that standard of review. And finally, it is unrealistic to ignore the fact that at the appellate stage the state has an interest in avoiding retrial where the error is harmless beyond a reasonable doubt. That interest counsels against requiring a new trial in every case.

---

system of justice as to require reversal in all cases, such as discrimination in jury selection. See, *e. g., Peters* v. *Kiff*, 407 U. S. 493 (1972). A deliberate effort of the prosecutor to undermine the search for truth clearly is in the category of offenses antithetical to our most basic vision of the role of the state in the criminal process.

Thus, while I believe that some review for harmlessness is in order, I disagree with the Court's standard, even were it merely a standard for review and not a definition of "materiality." First, I see no significant difference for truth-seeking purposes between the *Giglio* situation and this one; for the same reasons I believe the result must therefore be the same here as in *Giglio*, see *supra*, at 691–692, I also believe the standard for reversal should be the same. The defendant's entitlement to a new trial ought to be no different in the two cases, and the burden he faces on appeal should also be the same. *Giglio* remains the law for a class of cases, and I reaffirm my belief that the same standard applies to this case as well. See *Agurs*, *supra*, at 119–120 (MARSHALL, J., dissenting).

Second, only a strict appellate standard, which places on the prosecutor a burden to defend his decisions, will remove the incentive to gamble on a finding of harmlessness. Any lesser standard, and especially one in which the defendant bears the burden of proof, provides the prosecutor with ample room to withhold favorable evidence, and provides a reviewing court with a simple means to affirm whenever in its view the correct result was reached. This is especially true given the speculative nature of retrospective review:

> "The appellate court's review of 'what might have been' is extremely difficult in the context of an adversarial system. Evidence is not introduced in a vacuum; rather, it is built upon. The absence of certain evidence may thus affect the usefulness, and hence the use, of other evidence to which defense counsel does have access. Indeed, the absence of a piece of evidence may affect the entire trial strategy of defense counsel." Capra, *supra*, at 412.

As a consequence, the appellate court no less than the prosecutor must substitute its judgment for that of the trier of fact under an inherently slippery test. Given such factors as a reviewing court's natural inclination to affirm a judgment

that appears "correct" and that court's obvious inability to know what a jury ever will do, only a strict and narrow test that places the burden of proof on the prosecutor will begin to prevent affirmances in cases in which the withheld evidence might have had an impact.

Even under the most protective standard of review, however, courts must be careful to focus on the nature of the evidence that was not made available to the defendant and not simply on the quantity of the evidence against the defendant separate from the withheld evidence. Otherwise, as the Court today acknowledges, the reviewing court risks overlooking the fact that a failure to disclose has a direct effect on the entire course of trial.

Without doubt, defense counsel develops his trial strategy based on the available evidence. A missing piece of information may well preclude the attorney from pursuing a strategy that potentially would be effective. His client might consequently be convicted even though nondisclosed information might have offered an additional or alternative defense, if not pure exculpation. Under such circumstances, a reviewing court must be sure not to focus on the amount of evidence supporting the verdict to determine whether the trier of fact reasonably would reach the same conclusion. Instead, the court must decide whether the prosecution has shown beyond a reasonable doubt that the new evidence, if disclosed and developed by reasonably competent counsel, would not have affected the outcome of trial.[7]

---

[7] For example, in *United States ex rel. Butler* v. *Maroney*, 319 F. 2d 622 (CA3 1963), the defendant was convicted of first-degree murder. Trial counsel based his defense on temporary insanity at the time of the murder. During trial, testimony suggested that the shooting might have been the accidental result of a struggle, but defense counsel did not develop that defense. It later turned out that an eyewitness to the shooting had given police a statement that the victim and Butler had struggled prior to the murder. If defense counsel had known before trial what the eyewitness had seen, he might have relied on an additional defense, and he might have emphasized the struggle. See Note, The Prosecutor's Constitutional

In this case, it is readily apparent that the undisclosed information would have had an impact on the defense presented at trial, and perhaps on the judgment. Counsel for Bagley argued to the trial judge that the Government's two key witnesses had fabricated their accounts of the drug distributions, but the trial judge rejected the argument for lack of any evidence of motive. See *supra*, at 690. These key witnesses, it turned out, were each to receive monetary rewards whose size was contingent on the usefulness of their assistance. These rewards "served only to strengthen any incentive to testify falsely in order to secure a conviction." *Ante*, at 683. To my mind, no more need be said; this non-

---

Duty to Reveal Evidence to the Defendant, 74 Yale L. J. 136, 145 (1964). Unless the same information already was known to counsel before trial, the failure to disclose evidence of that kind simply cannot be harmless because reasonably competent counsel might have utilized it to yield a different outcome. No matter how overwhelming the evidence that Butler committed the murder, he had a right to go before a trier of fact and present his best available defense.

Similarly, in *Ashley* v. *Texas*, 319 F. 2d 80 (CA5), cert. denied, 375 U. S. 931 (1963), the defendant was sentenced to death for murder. The prosecutor disclosed to the defense a psychiatrist's report indicating that the defendant was sane, but he failed to disclose the reports of a psychiatrist and a psychologist indicating that the defendant was insane. The nondisclosed information did not relate to the trial defense of self-defense. But the failure to disclose the evidence clearly prevented defense counsel from developing the possibly dispositive defense that he might have developed through further psychiatric examinations and presentation at trial. The nondisclosed evidence obviously threw off the entire course of trial preparation, and a new trial was in order. In such a case, there simply is no need to consider—in light of the evidence that actually was presented and the quantity of evidence to support the verdict returned—the possible effect of the information on the particular jury that heard the case. Indeed, to make such an evaluation would be to substitute the reviewing court's judgment of the facts, including the previously undisclosed evidence, for that of the jury, and to do so without the benefit of competent counsel's development of the information.

See also Field, Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale, 125 U. Pa. L. Rev. 15 (1976) (discussing application of harmless-error test).

disclosure could not have been harmless. I would affirm the judgment of the Court of Appeals.

JUSTICE STEVENS, dissenting.

This case involves a straightforward application of the rule announced in *Brady* v. *Maryland*, 373 U. S. 83 (1963), a case involving nondisclosure of material evidence by the prosecution in response to a specific request from the defense. I agree that the Court of Appeals misdescribed that rule, see *ante*, at 674–678, but I respectfully dissent from the Court's unwarranted decision to rewrite the rule itself.

As the Court correctly notes at the outset of its opinion, *ante*, at 669, the holding in *Brady* was that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U. S., at 87. We noted in *United States* v. *Agurs*, 427 U. S. 97, 103 (1976), that the rule of *Brady* arguably might apply in three different situations involving the discovery, after trial, of evidence that had been known prior to trial to the prosecution but not to the defense. Our holding in *Agurs* was that the *Brady* rule applies in two of the situations, but not in the third.

The two situations in which the rule applies are those demonstrating the prosecution's knowing use of perjured testimony, exemplified by *Mooney* v. *Holohan*, 294 U. S. 103 (1935), and the prosecution's suppression of favorable evidence specifically requested by the defendant, exemplified by *Brady* itself. In both situations, the prosecution's deliberate nondisclosure constitutes constitutional error—the conviction must be set aside if the suppressed or perjured evidence was "material" and there was "any reasonable likelihood" that it "could have affected" the outcome of the trial. 427 U. S., at 103.[1] See *Brady, supra*, at 88 ("would tend to exculpate");

---

[1] I do not agree with the Court's reference to the "constitutional error, *if any*, in this case," see *ante*, at 678 (emphasis added), because I believe a violation of the *Brady* rule is by definition constitutional error. Cf. *United*

accord, *United States* v. *Valenzuela-Bernal*, 458 U. S. 858, 874 (1982) ("reasonable likelihood"); *Giglio* v. *United States*, 405 U. S. 150, 154 (1972) ("reasonable likelihood"); *Napue* v. *Illinois*, 360 U. S. 264, 272 (1959) ("may have had an effect on the outcome"). The combination of willful prosecutorial suppression of evidence and, "more importantly," the potential "corruption of the truth-seeking function of the trial process" requires that result. 427 U. S., at 104, 106.[2]

In *Brady*, the suppressed confession was *inadmissible* as to guilt and "could not have affected the outcome" on that issue. 427 U. S., at 106. However, the evidence "could have affected Brady's punishment," and was, therefore, "material on the latter issue but not on the former." *Ibid.* Material-

---

*States* v. *Agurs*, 427 U. S., at 112 (rejecting rule making "every nondisclosure . . . automatic error" outside the *Brady* specific request or perjury contexts). As written, the *Brady* rule states that the Due Process Clause is violated when favorable evidence is not turned over "upon request" and "the evidence is material either to guilt or punishment." *Brady* v. *Maryland*, 373 U. S., at 87. As JUSTICE MARSHALL's explication of the record in this case demonstrates, *ante*, at 685–692, the suppressed evidence here was not only favorable to Bagley, but also unquestionably material to the issue of his guilt or innocence. The two witnesses who had signed the undisclosed "Contract[s] for Purchase of Information" were the only trial witnesses as to the two distribution counts on which Bagley was convicted. On cross-examination defense counsel attempted to undercut the witnesses' credibility, obviously a central issue, but had little factual basis for so doing. When defense counsel suggested a lack of credibility during final argument in the bench trial, the trial judge demurred, because "I really did not get the impression at all that either one or both of these men were trying at least in court here to make a case against the defendant." A finding that evidence showing that the witnesses in fact had a "direct, personal stake in respondent's conviction," *ante*, at 683, was nevertheless not "material" would be egregiously erroneous under any standard.

[2] "A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . ." *Brady, supra,* at 87–88.

ity was thus used to describe admissible evidence that "could have affected" a dispositive issue in the trial.

The question in *Agurs* was whether the *Brady* rule should be *extended*, to cover a case in which there had been neither perjury nor a specific request—that is, whether the prosecution has some constitutional duty to search its files and disclose automatically, or in response to a general request, all evidence that "might have helped the defense, or might have affected the outcome." 427 U. S., at 110.[3] Such evidence would, of course, be covered by the *Brady* formulation if it were specifically requested. We noted in *Agurs*, however, that because there had been no specific defense request for the later-discovered evidence, there was no notice to the prosecution that the defense did not already have that evidence or that it considered the evidence to be of particular value. 427 U. S., at 106–107. Consequently, we stated that in the absence of a request the prosecution has a constitutional duty to volunteer only "obviously exculpatory . . . evidence." *Id.*, at 107. Because this constitutional duty to disclose is *different* from the duty described in *Brady*, it is not surprising that we developed a different standard of materiality in the *Agurs* context. Necessarily describing the "inevitably imprecise" standard in terms appropriate to post-trial review, we held that no constitutional violation occurs in the absence of a specific request unless "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.*, at 108, 112.[4]

---

[3] "[W]e conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all . . . .

"We now consider whether the prosecutor has any constitutional duty to volunteer exculpatory matter to the defense, and if so, what standard of materiality gives rise to that duty." 427 U. S., at 107.

[4] "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only

What the Court ignores with regard to *Agurs* is that its analysis was restricted entirely to the general or no-request context.[5] The "standard of materiality" we fashioned for the purpose of determining whether a prosecutor's failure to *volunteer* exculpatory evidence amounted to constitutional error was and is unnecessary with regard to the two categories of prosecutorial suppression already covered by the *Brady* rule. The specific situation in *Agurs*, as well as the circumstances of *United States* v. *Valenzuela-Bernal*, 458 U. S. 858 (1982) and *Strickland* v. *Washington*, 466 U. S. 668 (1984), simply falls "outside the *Brady* context." *Ante*, at 681.

But the *Brady* rule itself unquestionably applies to this case, because the Government failed to disclose favorable evidence that was clearly responsive to the defendant's specific

---

if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Id.*, at 112 (footnote omitted).

We also held in *Agurs* that when no request for particular information is made, post-trial determination of whether a failure voluntarily to disclose exculpatory evidence amounts to constitutional error depends on the "character of the evidence, not the character of the prosecutor." *Id.*, at 110. Nevertheless, implicitly acknowledging the broad discretion that trial and appellate courts must have to ensure fairness in this area, we noted that "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id.*, at 108. Finally, we noted that the post-trial determination of reasonable doubt will vary even in the no-request context, depending on all the circumstances of each case. For example, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.*, at 113.

[5] See *ante*, at 678 ("Our starting point is the framework for evaluating the materiality of *Brady* evidence established in *United States* v. *Agurs*"); *ante*, at 681 (referring generally to "the *Agurs* standard for the materiality of undisclosed evidence"); *ante*, at 700 (MARSHALL, J., dissenting) (describing *Agurs* as stating a general rule that "there is no constitutional duty to disclose evidence unless nondisclosure would have a certain impact on the trial"). But see Babcock, Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel, 34 Stan. L. Rev. 1133, 1148 (1982) (*Agurs* "distinguished" between no-request situations and the other two *Brady* contexts "where a pro-defense standard . . . would continue").

request. Bagley's conviction therefore must be set aside if the suppressed evidence was "material"—and it obviously was, see n. 1, *supra*—and if there is "any reasonable likelihood" that it could have affected the judgment of the trier of fact. Our choice, therefore, should be merely whether to affirm for the reasons stated in Part I of JUSTICE MARSHALL's dissent, or to remand to the Court of Appeals for further review under the standard stated in *Brady*. I would follow the latter course, not because I disagree with JUSTICE MARSHALL's analysis of the record, but because I do not believe this Court should perform the task of reviewing trial transcripts in the first instance. See *United States* v. *Hasting*, 461 U. S. 499, 516–517 (1983) (STEVENS, J., concurring in judgment). I am confident that the Court of Appeals would reach the appropriate result if it applied the proper standard.

The Court, however, today sets out a reformulation of the *Brady* rule in which I have no such confidence. Even though the prosecution suppressed evidence that was specifically requested, apparently the Court of Appeals may now reverse only if there is a "reasonable probability" that the suppressed evidence "would" have altered "the result of the [trial]." *Ante*, at 682, 684. According to the Court this single rule is "sufficiently flexible" to cover specific as well as general or no-request instances of nondisclosure, *ante*, at 682, because, at least in the view of JUSTICE BLACKMUN and JUSTICE O'CONNOR, a reviewing court can "consider directly" under this standard the more threatening effect that nondisclosure in response to a specific defense request will generally have on the truth-seeking function of the adversary process. *Ante*, at 683 (opinion of BLACKMUN, J.).[6]

---

[6] I of course agree with JUSTICE BLACKMUN, *ante*, at 679–680, n. 9, and 684, and JUSTICE MARSHALL, *ante*, at 706, that our long line of precedents establishing the "reasonable likelihood" standard for use of perjured testimony remains intact. I also note that the Court plainly envisions that reversal of Bagley's conviction would be possible on remand even under the new standard formulated today for specific-request cases. See *ante*, at 684.

I cannot agree. The Court's approach stretches the concept of "materiality" beyond any recognizable scope, transforming it from merely an evidentiary concept as used in *Brady* and *Agurs*, which required that material evidence be admissible and probative of guilt or innocence in the context of a specific request, into a result-focused standard that seems to include an independent weight in favor of affirming convictions despite evidentiary suppression. Evidence favorable to an accused and relevant to the dispositive issue of guilt apparently may still be found not "material," and hence suppressible by prosecutors prior to trial, unless there is a reasonable probability that its use would result in an acquittal. JUSTICE MARSHALL rightly criticizes the incentives such a standard creates for prosecutors "to gamble, to play the odds, and to take a chance that evidence will later turn out not to have been potentially dispositive." *Ante*, at 701.

Moreover, the Court's analysis reduces the significance of deliberate prosecutorial suppression of potentially exculpatory evidence to that merely of one of numerous factors that "may" be considered by a reviewing court. *Ante*, at 683 (opinion of BLACKMUN, J.). This is not faithful to our statement in *Agurs* that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." 427 U. S., at 106. Such suppression is far more serious than mere nondisclosure of evidence in which the defense has expressed no particular interest. A reviewing court should attach great significance to silence in the face of a specific request, when responsive evidence is later shown to have been in the Government's possession. Such silence actively misleads in the same way as would an affirmative representation that exculpatory evidence does not exist when, in fact, it does (*i. e.*, perjury)—indeed, the two situations are aptly described as "sides of a single coin." Babcock, Fair Play: Evidence Favorable to

an Accused and Effective Assistance of Counsel, 34 Stan. L. Rev. 1133, 1151 (1982).

Accordingly, although the judgment of the Court of Appeals should be vacated and the case should be remanded for further proceedings, I disagree with the Court's statement of the correct standard to be applied. I therefore respectfully dissent from the judgment that the case be remanded for determination under the Court's new standard.