823 F.2d 549
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Zachary JOINES, Defendant-Appellant.
 No. 86-5614
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1987.
Decided June 24, 1987.
 
 Robert Stanley Powell, for appellant.
 Ellyn Marcus Lindsay, Special Assistant United States Attorney (Henry E. Hudson, United States Attorney, on brief), for appellee.
 Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Zachary Joines was tried by a jury in the United States District Court for the Eastern District of Virginia. He was convicted on one count of rape, in violation of 18 U.S.C. Sec. 2031, and one count of forcible sodomy, in violation of 18 U.S.C. Sec. 13, assimilating Code of Virginia Section 18.2-67.1. Motions for a judgment of acquittal and for a new trial were denied and Joines was sentenced to consecutive life terms pursuant to 18 U.S.C. Sec. 4244(d).
 
 
 2
 The victim's version of the events of September 30, 1985 was as follows:
 
 
 3
 Susan Kelly, a private in the United States Army was awaiting transfer from Fort Belvoir, Virginia, to the Defense Language Institute, Presidio, San Francisco. On her last day at Fort Belvoir, Kelly performed her regular duties and then went to the base snack bar with her student friends. Kelly left the snack bar with her friends at about 9:00 P.M. and returned by herself at about 9:45 P.M. She purchased a beer and some chips and sat down at an empty table. Kelly did not know that Joines, who was shooting pool, had been sitting at the same table. Joines approached Kelly and entered into conversation with her. Joines had been playing pool with people Kelly recognized to be with the Delta Company at Fort Belvoir, and she believed Joines was affiliated with the Army.
 
 
 4
 Some of the group from Delta Company decided to go to Washington, D.C. and Kelly decided to go with them. Joines was the first person to offer her a ride and she accepted. Joines drove a blue pick-up truck.
 
 
 5
 On the way, Joines stopped at his mother's house to pick up a key. They drove without incident to a bar in Old Town Alexandria, Virginia and found that the group from Delta Company was already there. Joines described a bar in Washington, D.C. and the group decided to visit it.
 
 
 6
 Joines and Kelly arrived at the Bayou Club in the District of Columbia and Joines bought Kelly a beer. She did not like the idea of people buying drinks for her so she bought the next round. They danced, but the only physical contact they had was when he reached out and grabbed her hand. They did not kiss. At about that time Kelly began to feel awkward with Joines because of the comments he was making. She told him she would take a cab home.
 
 
 7
 Joines insisted on driving Kelly back to Fort Belvoir and promised to take her directly to the barracks. Despite the promise, Joines stopped in Maryland to purchase gas and wine coolers. Kelly became angry upon learning that she was in Maryland and demanded to be taken back to Fort Belvoir. Joines began to drive.
 
 
 8
 Kelly closed her eyes and may have slept. When she opened them she saw that they were in a wooded area. She demanded to be taken to Fort Belvoir immediately, but Joines reached over and put his hand on her neck as if to draw her toward him. She knocked his hand away and repeated her demand. He acquiesced.
 
 
 9
 Joines drove back to Fort Belvoir and parked in a far corner of the barracks parking lot. Kelly felt safe because she was close to the barracks and could see the charge-of-quarters (CQ) inside. Therefore, when Joines insisted she have a wine cooler, she agreed in order not to hurt his feelings. After a sip or two she moved to open the door of the truck.
 
 
 10
 Joines grabbed her by the shoulders and pulled her back inside. He forced her down on the seat and threw his body on top of her pinning her down. He pulled down her pants and began to perform oral sex on her. She cried and begged him to stop but to no avail. Kelly testified that she did not scream or try to hit Joines because she had been brutally raped and beaten once before and was afraid of being beaten up again.
 
 
 11
 Joines unzipped his pants and Kelly, afraid that he was going to force her to have oral sex, turned her face towards the seat. Joines turned around and Kelly felt a sharp pain inside her rectum. She cried out in pain and Joines ceased what he was doing and began to have intercourse with her. Just before he 'came' Kelly managed, with all her might, to push him off. She got out of the car, pulled off her pants and ran into the barracks crying hysterically, leaving her purse and coat behind.
 
 
 12
 Joines took the purse, walked to her barracks, and asked to see Kelly. Private Patrick Masanto, one of the CQ's on duty, testified that Joines appeared very suspicious, his face was flushed, he was nervous and he acted 'hyper, just fidgety.'
 
 
 13
 At trial the government introduced evidence of Kelly's statements to the Army investigators and to the FBI. These accounts differ slightly (i.e., whether she slept or merely rested in the truck on the way back to Fort Belvoir) but are consistent regarding the important events leading up to and surrounding the attack.
 
 
 14
 There was overwhelming evidence to establish the existence of the rape and sodomy charged. The defendant tried to assert concealment of Brady exculpatory evidence concerning a rape of the victim several years earlier when she was only sixteen years of age. Before the trial there had been a request for information about the prior rape, but the government ascertained that she had made no report of the offense out of embarrassment and only later told her sister.
 
 
 15
 Given that most of the information about the prior rape was disclosed or could have been disclosed when the rape victim testified, further realizing that the prior rape had been introduced only to show why she had not offered resistance when the crime or crimes charged took place and recognizing that no written records appear to be in existence, there is some doubt that a Brady situation had existed.
 
 
 16
 Giving the benefit of any doubt to Joines, we assume that there has been a violation of the rule in the Brady case.[1] However, that assumption does not avail Joines because the substantial evidence of guilt abundantly sufficed to render the error harmless.[2]
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 Brady v. Maryland, 373 U.S. 83 (1963)
 
 
 [2]
 A conviction should be reversed on account of a Brady violation 'only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. United States v. Bagley, ---- U.S. ----, ----, 105 S. Ct. 3375, 3381 (1985). Since there is not a reasonable probability that disclosure of evidence of the prior rape would have affected the outcome of the trial, even if there was a Brady error such error was harmless. Id. at 3384-85
 The appellant's contention that the government's alleged failure to provide counselling records also constituted a Brady violation and that extraneous matters were considered by the jury are devoid of merit.