**UNITED STATES of America, Appellee,**

v.

**William Joseph PANDOZZI,
Defendant, Appellant.**

Nos. 88–2114, 88–2160.

United States Court of Appeals,
First Circuit.

Heard May 3, 1989.

Decided June 29, 1989.

Robert B. Mann, Providence, R.I., for defendant, appellant.

Jacques B. Gelin, Dept. of Justice, Washington, D.C., with whom Donald A. Carr, Acting Asst. Atty. Gen., Lincoln C. Almond, U.S. Atty., Providence, R.I., David C. Shilton and James A. Morgulec, Dept. of Justice, Washington, D.C., were on brief, for the U.S.

Before BOWNES and BREYER, Circuit Judges, and GRAY,* Senior District Judge.

BREYER, Circuit Judge.

William Pandozzi appeals from his conviction for perjury before a grand jury. 18 U.S.C. § 1623(a). Pandozzi worked as a foreman and truck driver for a waste management company, MacDonald & Watson, at Narragansett Improvement, a storage facility and asphalt plant that MacDonald & Watson used. Narragansett, among other things, collected used or spilled industrial oil, coolants, and other gasoline/oil/water mixtures and transported them to its plant, stored these liquids in tanks, and eventually used them in making asphalt. In 1987 Pandozzi, when appearing before a federal grand jury investigating environmental crimes, testified as follows:

> Q: Did you ever have occasion to dump any of these coolants down the drains at Narragansett Improvement?
>
> A: No.
>
> \* \* \* \* \* \*
>
> Q: Did you ever have occasion, sir, to hook up the hoses to such a truck and dump the material down a storm drain at Narragansett Improvement?
>
> A: Never had an occasion.
>
> Q: Did you ever have occasion to observe someone else do that, sir?
>
> A: No, sir.
>
> Q: Did you ever have occasion to be asked to do that sir?
>
> A: No, sir.
>
> \* \* \* \* \* \*
>
> Q: Did you ever have occasion, sir, to empty the contents of any of these large storage tanks into the storm sewer system during the course of these late hours?
>
> A: No, sir. I don't see how that could be done.
>
> Q: Did you ever have occasion to unload any trucks, during these late hours, into the storm drains at Narragansett Improvement?
>
> A: No, sir.
>
> \* \* \* \* \* \*
>
> Q: Did you, in fact, [ever] ... dump or dispose of any of this material or any other liquids down the storm drains at Narragansett Improvement during the months of December, January, February, or March of the last four years?
>
> A: No, sir.
>
> Q: Did you ever have occasion to observe anyone else doing that, sir?
>
> A: No, sir.
>
> Q: Did you ever have occasion to be asked to do that, sir?
>
> A: No, sir.
>
> \* \* \* \* \* \*
>
> Q: Did you ever take responsibility for those trucks and proceed to drive them to Narragansett Improvement, sir, and dispose of the contents down the storm drains?
>
> A: No, sir.
>
> Q: Did you ever have occasion to assist anyone else to do that, sir?
>
> A: No, sir.
>
> \* \* \* \* \* \*
>
> Q: During the course of your employment with MacDonald & Watson, sir, have you ever had occasion to dispose of

* Of the Central District of California, sitting by designation.

any liquid material down any drain at Narragansett Improvement Company?

A: I have never done so.

The government, believing these answers false, later offered Pandozzi an opportunity to recant his testimony. *See* 18 U.S.C. § 1623(d). He refused the opportunity. The grand jury then indicted him for perjury.

The government presented its case at trial mainly through the testimony of two other Narragansett truck drivers, William Major and Bruce Vincent. Both said they had seen Pandozzi dump mixtures of oil, gas, and water from trucks or storage tanks into storm drains at Narragansett. Pandozzi's defense basically consisted of an effort to impeach these witnesses; of evidence that the storage tanks had adequate room to store the liquids, so he had no motive for illegal dumping; and of his own denials of illegal dumping.

The jury convicted Pandozzi. Subsequently, the government gave Pandozzi 52 documents, which it said it had inadvertently failed to turn over before trial. Pandozzi then asked for a new trial on the ground that the documents contained significant material "favorable to the accused." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *see United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). The district court denied the motion. Pandozzi now appeals this denial, and his conviction. After reviewing the record, we conclude that the district court's determinations were lawful.

## I.

### The Undisclosed Documents

The Supreme Court set forth the legal standard relevant to appellant's major claim in *Bagley*. It wrote that the government must

> disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*Id.*, 473 U.S. at 675, 105 S.Ct. at 3380. It added that undisclosed

> evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383. We have reviewed the documents the government provided to the defense after trial, in light of the full record of the trial itself. Mindful of the fact that the district court, closer to the trial than we are, found that the government's nondisclosure did not entitle Pandozzi to a new trial, we have reached the same conclusion. *United States v. Petrillo*, 821 F.2d 85, 88 (2d Cir.1987) ("the trial court's rulings are given great deference on [*Brady*] issues because it presided over the trial and is better able to determine the effect the new materials would have had"). Giving proper weight to the trial court's determination, we cannot say that the added advantages that the undisclosed documents might have offered the defense are sufficient to "undermine" our "confidence in the outcome" of the trial. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. We shall briefly explain why.

1. *Major's prior statement.* Pandozzi's coworker William Major testified about two critical incidents. He said that in the spring of 1984 he collected a spill of oil, gas, and water from a gas station in North Kingston, Rhode Island, drove it to Narragansett, and saw Pandozzi dump it down a storm drain. He also said that, about a month later, he drove a truckload of soluble oil and water from Worcester, Massachusetts to Narrangansett, which Pandozzi disposed of "in the same manner."

As part of its effort to impeach Major, the defense called Martin Cappelli, a Rhode Island environmental investigator, to ask him about an interview that he had with Major on May 5, 1986. The defense had a memorandum that Cappelli wrote two days later, summarizing the interview. The memorandum fills four single-spaced

pages, and covers many topics. At one point, the memorandum describes the events surrounding the North Kingston spill as follows:

> The Source spoke about the pollution of wells on Tower Hill Road in North Kingston, R.I. being caused by a gasoline leak.... He explained that he was instructed by MacDonald Watson President Eugene D'Allesandro to remove the approximately 5,500 gallons of contaminated liquid containing gasoline, oil and water in a surreptitious manner.... The Source explained further he was directed to transport the 5,500 gallons described above to the Narragansett Improvement Company on Allens Avenue, Providence, R.I. *where it was placed into holding tanks.* The Source explained that it was his belief that this material was to be subsequently sprayed upon soil and gravel which was used in the manufacture of asphalt although he did not make this observation. He explained further that it was his belief from discussion with one William Pandozzi that liquid wastes of various types were disposed of in this manner.

(emphasis added). Defense counsel pointed out to Cappelli that what he reported Major as saying, namely that the spill liquid was "placed into holding tanks," was inconsistent with Major's trial testimony that Pandozzi dumped this liquid down the storm drain. (Major, on cross-examination, had denied making this prior inconsistent statement on May 5.) Capelli said that Major's trial testimony was correct, and that Major had never said the liquid was placed in holding tanks. Rather, Cappelli said he had misunderstood Major on May 5, mistaking Major's explanation about what Narragansett was *supposed* to do with coolants, for a statement about what *actually* happened to the North Kingston spill liquid. Cappelli explained the discrepancy as follows:

> I evidently did not put in there that the material was disposed of down into drains. He was merely explaining to me what the procedure was supposed to be at Narragansett Improvement. As far as the information that he had given me,

he had given me other information in them statements which I found him to be credible and so forth. So I believe that I made the mistake by not recording that on the statement at that time.

Subsequently, defense counsel found, among the 52 undisclosed documents, another memorandum written by Detective Harold Watson of the Rhode Island State Police, who was also present at the May 5, 1986 interview with Major. Watson's report describes that interview in language almost identical to that used by Cappelli, and also says that Major said the liquid was "placed in a holding tank." Pandozzi argues that, had he known of Watson's memo, he would have called Watson as a witness and confronted him with his memo. And, since it would seem incredible that Watson and Cappelli both made the *same* mistake in summarizing Major's statements, calling Watson might have led the jury to think that Major really had said the Kingston spill went into tanks, and that Major's trial testimony that Pandozzi poured it down the drains was false. *See Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380 ("evidence that the defense might have used to impeach the Government's witnesses," as well as exculpatory evidence, must be disclosed).

Pandozzi's argument is not convincing for the simple reason that Cappelli's memo itself lists three co-authors, including Detective Watson. The defense thus knew from the outset that Watson was present at the May 5 interview, and that the Cappelli/Watson memo likely represented Watson's as well as Cappelli's views about what Major said. If the defense had wanted to call Watson as a witness and find out what he thought Major had said, it could have done so. This fact suggests that the government, in failing to provide this second memo, did not violate its obligation to disclose favorable information to the defense, for "*Brady* does not require the government to turn over information which, 'with any reasonable diligence, [the defendant] can obtain himself.'" *Jarrell v. Balkcom,* 735 F.2d 1242, 1258 (11th Cir. 1984) (quoting *United States v. Campag-*

*nuolo,* 592 F.2d 852, 861 (5th Cir.1979)), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985); *see also United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982) (evidence is not "suppressed" within the meaning of *Brady* if the defendant knew or should have known of "essential facts permitting him to take advantage of any exculpatory evidence"); *United States v. Stewart,* 513 F.2d 957, 960 (2d Cir.1975) (government not required to disclose a witness's prior testimony if the defendant is "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish"); *cf. United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980).

Regardless, we cannot say that the failure to disclose Watson's memo could have made a difference in the trial's outcome. The fact that a separate memo existed *might* have influenced defense counsel's decision whether to call Watson. But calling Watson would have been risky, for he might simply have agreed with Cappelli that they had both misunderstood Major on May 5, and that Major's trial testimony was correct. (And, calling Watson would bring out the fact that other parts of Watson's memo, as well as Cappelli's, corroborated Major's trial testimony.) Whether Watson's testimony would have led the jury to reject his and Cappelli's explanation of the inconsistency, and hence doubt Major's credibility, or whether it would have led the jury to dismiss the inconsistencies as understandable confusion on the officers' part, depends on just what Watson would have said. We cannot now say that the difference between defense counsel's (a) having had a memo listing Watson as a coauthor, and (b) having had a second memo in which Watson describes the May 5 interview the same way the first memo described it, is so likely to have influenced the outcome as to undermine our confidence in the verdict. *See Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

■ 2. *Major's bargaining with the government.* Major, after he had been convicted of sexual assault, agreed to testify against Pandozzi. The government provided Pandozzi with a list of all promises it made to Major. When he cross-examined Major, Pandozzi's counsel brought out all such promises, including: participation in a witness protection program; favorable testimony at Major's sentence reduction hearing, and later at his parole hearing; transfer to a prison outside Rhode Island; and immunity from use of his testimony against him. The defense also brought out the fact that Major had wanted, but did not get, a sentence of probation. During cross-examination, Major said to defense counsel, "if you were doing the time I'm doing you'd do anything you could to get an earlier parole."

Pandozzi now points to several undisclosed documents which, he says, would have helped significantly in impeaching Major. Having examined them, we disagree.

a. Some documents list other demands that Major made during his negotiations with the government. Since the government did not agree to these demands, however, and since it was obvious to the jury that Major had negotiated at some length, we see nothing here that would be useful to impeach Major, and thus would be "favorable to the accused." *See Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380.

b. One document consists of an anonymous handwritten note, apparently made during negotiations with Major, which says:

*Witness protection plan*
—new name
—new SS #
—new driver's lic.
—$1000 to get started (negotiable)
—bankruptcy action for $10,000 debt
—paid sex offender therapy

Major testified, in respect to his witness protection program request, that he had "asked only for a change of identity and categorically refused any financial aid." The presence of "$1,000 to get started" on this list might have helped the defense show an inconsistency in his testimony. But, in the context of thorough cross-examination of Major about his incentives to testify, we do not believe that such a show-

ing would have added anything significant to the defendant's case. There is no "reasonable probability," see Bagley, 473 U.S. at 682, 105 S.Ct. at 3383, that the nondisclosure of these notes would have affected the outcome of the case.

c. Two letters from Major's counsel to Major include the following passages:

Testify reluctantly. You know what this means.

This would avoid contempt, maybe. It would also preclude any benefits to you from your testimony.

\* \* \* \* \* \*

First, don't boast of your failed memory. This won't endear you to anyone since it is patently false. Save your claims of memory losses for when you may actually have them (in answer to specific questions before a grand jury, for example).

Pandozzi says these passages would have helped show that Major was willing to lie. In our view, however, they suggest, at most, a willingness to refuse to cooperate, to "stonewall," which is not the same thing, and which would already have been apparent to the jury from the fact that Major extracted significant promises from the government in return for his testimony.

3. *Vincent's prior statement.* Bruce Vincent, another of Pandozzi's coworkers, testified at trial. He said:

Q: ... did you see Mr. Pandozzi dumping materials down the drains on a regular basis during the time that you were there?

A. Yes.

Q: Approximately how often did Mr. Pandozzi dump materials down the drains?

A: I wasn't always there. On different occasions when I was there—I wasn't—I was in and out of there, like maybe roughly I'd see it maybe once a week.

Vincent said on cross-examination that the relevant time period was about two and a half years.

On cross-examination Pandozzi's counsel tried to impeach Vincent by confronting him with his grand jury testimony, in which he said that he'd seen Pandozzi pour liquid down the drain, not "once a week" for two and a half years, but only "a dozen times" in all. Vincent then said:

It was—it was wrong for me to say a dozen times. I don't know. It happened frequently.... It's been awhile, and it was something that was done frequently.

Pandozzi has found, among the 52 undisclosed documents, a report that an EPA agent, Peter Gerbino, wrote about his interview with Vincent on April 16, 1987. This typed report says, in part:

Vincent stated that approximately ten times a year during his entire employment period he transported liquid waste to the Narragansett Improvement Co., Providence, RI, Yard which was illegally dumped into a storm drain by MW employee Billy (William) Pandozzi.... Vincent stated that on one occasion he actually observed Pandozzi place a hose directly from a tank truck into a storm drain in the Narragansett Yard and empty the tank truck. He believed this liquid waste was gasoline or oil contaminated with water.

Pandozzi reads this memo, not as saying that Vincent saw Pandozzi dump liquid waste about ten times a year *including* once when he saw Pandozzi run a hose "directly" from a truck into a drain, but as saying that Vincent *only* saw Pandozzi dump liquid waste "on one occasion." Interpreted this way, he says, the report would have been useful in impeaching Major.

We disagree with Pandozzi about the importance of this document, because the defense had in its possession what appear to be the actual handwritten notes of the same interview, and the notes provide essentially the same information. These handwritten notes read as follows:

Observed

Down Drain by line in sewer line

on one occas

probably H2O & gas

or oil & gas

Billy Pandozzi

always in charge

James Berry (make valves), Worcester

Pumping Drains (because no storage tanks)—oil, contaminated H2O

entire employment period—at least once a week—sometimes [ ] times a week w/ 6500 total 2 compartment Vacuum Tanker Oil in front (smaller capacity)

Everytime lines were hooked up to [ ] & went long distances to appear to go to storage tanks at Narragansett probably into sewer lines

10 times a year for employment period [ ] contaminated liquid

(brackets indicate illegible words). Given the fact that the defense had these notes, we find no violation of law here, for the same reasons we gave in respect to the Watson memo. *See* pp. 1529–30, *supra.* The defense already had roughly equivalent information, and could, by reasonable diligence, have clarified and expanded on this information. That is to say, given the disclosure of the handwritten notes, the nondisclosure of the typed report could not have made enough of a difference to undermine our confidence in the outcome of the trial. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

3. *The remaining documents.* We have read the rest of the 52 documents, and, like the district court, we can find no information in them that could have made a difference to the outcome of the trial.

## II.

### Other Issues

Pandozzi raises a host of other claims, none of which we find convincing. We shall discuss them briefly to indicate our basic reasoning.

■ 1. Pandozzi says that the court should have declared a mistrial because the government did not tell his counsel that Cappelli, when confronted with the inconsistency between his memo of the interview with Major and Major's testimony, would say he had made a mistake. *See* p. 1529, *supra.* We are not aware, however, of any case law suggesting that the government must tell a defendant whether, or how, a witness will try to explain apparent incon-

sistencies. We do not agree with Pandozzi that the government's failure to warn him (about a fairly obvious possible result of calling Cappelli as a defense witness) is somehow akin to its knowing use of perjured testimony. *See Napue v. Illinois,* 360 U.S. 264, 272, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959) (prosecution may not use false testimony); *United States v. Kattar,* 840 F.2d 118, 127 (1st Cir.1988). Here, however, the prosecution did not use false testimony against Pandozzi. The record does not show that, at any time, the government knew which version of Major's story was the truth; at no point was the version of Major's statements described in Cappelli's memo proven inaccurate. *See Kattar,* 840 F.2d at 127. Compared to the use of perjured testimony, the degree of turpitude on the prosecutor's part and of unfairness to the defense here is far less; the administrative burden of a duty to warn the defense about potentially damaging testimony would be far greater.

■ 2. Pandozzi argues that the next-to-last sentence in Cappelli's explanation of his mistake, *see* p. 1528, *supra,* stating that Major "had given me other information in them statements which I found him to be credible and so forth," amounts to an impermissible evaluation of the credibility of another witness. *See* Fed.R.Evid. 608(a) (testimony in support of a witness' credibility is admissible only under certain conditions). We agree with the trial court, however, that the statement in question is more appropriately characterized as a part of Cappelli's explanation of why he thought he had made a mistake, not as an evaluation of Major's character for veracity.

■ 3. Pandozzi argues that the record does not reveal what the grand jury was investigating, nor does it demonstrate that his false statement was "material" to the grand jury's inquiry. 18 U.S.C. § 1623(a).

A statement is material if "it is 'capable of influencing the tribunal' " as to "any proper matter of the [grand] jury's inquiry," *United States v. Scivola,* 766 F.2d 37, 44 (1st Cir.1985) (quoting *United States v. Giarratano,* 622 F.2d 153, 156 (5th Cir. 1980)), that is, if it "might have influenced

the grand jury" or "impeded or hampered" its inquiry, *United States v. Goguen,* 723 F.2d 1012, 1019 (1st Cir.1983). As the district court found, the fairly lengthy excerpts from Pandozzi's grand jury testimony that the prosecutor read into the record demonstrate adequately that the grand jury was investigating environmental crimes. *See United States v. Ostertag,* 671 F.2d 262, 264–65 (8th Cir.1982); *United States v. Abrams,* 568 F.2d 411, 421 (5th Cir.1978) ("the best way to know what the grand jury deems material is by reading what it asked about"). And, a false statement about pouring polluting liquids down storm drains seems to us (as it did to the trial court) obviously "capable of influencing" the grand jury in its investigation of environmental crimes. *Scivola,* 766 F.2d at 44; *see United States v. Stackpole,* 811 F.2d 689, 695 (1st Cir.1987) (materiality is a question of law, to be decided by the trial court, not the jury).

Pandozzi goes on to say that the government indicted him the very day he decided not to recant his testimony, and the statute permits him to recant only if his false declaration "has not substantially affected the proceeding." 18 U.S.C. § 1623(d); *see Scivola,* 766 F.2d at 45. Hence, he argues, his testimony could not yet have been "material" when the government indicted him. The short answer to this claim, however, is that the test for recantation ("has not substantially affected the proceeding") is far stronger than the test for materiality ("capable of influencing" the grand jury). The offer of recantation is not sufficient to demonstrate that Pandozzi's false statements were not material. *United States v. Moore,* 613 F.2d 1029, 1037–38 (D.C.Cir. 1979) ("a finding of no substantial effect is not the equivalent of a ruling for the defendant on the issue of materiality ... the effect necessary to meet the materiality test is relatively slight").

■ 4. Pandozzi says that his false statement was merely an "exculpatory no," *i.e.,* a simple denial that he committed a crime, which, he says, this court has found to fall outside the scope of perjury statutes. But that is not what this court has held. Rather, we had said that simple denials of involvement in crime are not "statements" within the meaning of a different statute, 18 U.S.C. § 1001, which is not at issue here. And, we reached that conclusion with regard to informal questioning by federal officers, not testimony under oath before a grand jury. *United States v. Chevoor,* 526 F.2d 178, 182 (1st Cir.1975); *see also United States v. Bush,* 503 F.2d 813 (5th Cir.1974). We explicitly distinguished the informal situation from perjury before a grand jury, and we noted that the government could properly charge the defendant, under the statute now at issue, § 1623(a), for making similar denials of involvement in crime in his grand jury testimony. *Chevoor,* 526 F.2d at 184; *see also Ostertag,* 671 F.2d at 265–66 (witnesses' "[b]lanket denials of involvement" may be "deemed material" if, given the particular factual circumstances, such denials could impede the grand jury's inquiry).

■ 5. Pandozzi argues that the district court should have permitted him to explore, in detail, the nature of Major's prior sexual assault conviction. He states that the relevant rule of evidence, Fed.R. Evid. 609(a)(1), permits the court to exclude evidence of a witness's prior felony conviction only if it is prejudicial to the *defendant,* not if it is prejudicial to the witness. *See* Notes of Conference Committee on Fed.R.Evid. 609, House Report No. 93–1597 ("the Conference determined that the prejudicial effect to be weighed against the probative value of the conviction is specifically the prejudicial effect *to the defendant.* The danger of prejudice to a witness other than the defendant ... was considered and rejected by the Conference as an element to be weighed in determining admissibility"); *Campbell v. Greer,* 831 F.2d 700, 704 (7th Cir.1987) (nondefendant witnesses' "prior convictions are admissible without any balancing test").

The fact that Major had been convicted of sexual assault was, however, before the jury. Major was cross-examined thoroughly about his sentence and about the rewards he wanted in return for his testimony. The court merely refused to let the

defense bring out the fact that the victim of the sexual assault was a child. We see nothing in Rule 609(a)(1) that requires a court, having admitted the prior conviction, to permit exploration of its factual details even if such details are irrelevant to the witness's credibility and would simply waste time and confuse the jury. But even if Rule 609(a)(1) were to require this, given the defense's thorough and effective cross-examination of Major, and the apparent irrelevance of the fact that the victim was a child to Major's character for truthfulness, any error in restricting Major's cross-examination was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

■ 6. Pandozzi argues that the court should not have permitted the government to reopen its case to call a state environmental engineer, Thomas Uva, who testified that the drains into which Pandozzi poured liquid connected with the public sewer system. The court allowed the government to reopen in response to Pandozzi's argument, at the close of the government's case, that his false statement could not have been "material" to the grand jury inquiry if the drains did not connect. The court offered Pandozzi a continuance to prepare for Uva's cross-examination, it allowed the defense to question Uva outside the jury's presence, and it told defense counsel, in respect to curing any prejudice from the reopening, "I'll give you anything you want." The court has "a fair degree of discretion" in deciding whether to let a party reopen its case. *See Blaikie v. Callahan,* 691 F.2d 64, 68 (1st Cir.1982). We can find nothing in the record to suggest that the district court acted beyond its lawful powers.

■ We also conclude that the court properly ruled that the government laid a sufficient evidentiary foundation for Uva's testimony that the Narragansett Bay Commission, for which he worked, did not permit Narragansett Improvement to dump pollutants into the public sewers. And, we conclude that the court properly denied Pandozzi's motion to strike all evidence of his pouring liquid down any drain other than the one Uva said connected with the public sewer. Pandozzi's false statement that he had never "dispose[d] of any liquid material down any drain" was "capable of influencing" the grand jury's inquiry, *see Scivola,* 766 F.2d at 44, by impeding or hampering further investigation, *see Goguen,* 723 F.2d at 1019, whether or not all the drains in question were later proved to connect with the sewer system.

■ 7. Pandozzi argues that the district court should not have granted a one week continuance, due to the death of a juror's father, in the midst of the jury's deliberations, after Pandozzi refused to proceed with eleven jurors. The district court, however, has broad power to decide whether or not to grant a continuance in such a situation. *See Tuitt v. Fair,* 822 F.2d 166, 172 (1st Cir.1987) ("broad discretion must be granted trial courts on matters of continuances") (quoting *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983)); *Cherry v. Director, State Board of Corrections,* 613 F.2d 1262, 1267 (5th Cir.1980) (mistrial not "manifestly necessary" when juror's mother died, because "the trial judge apparently did not canvass the alternatives such as continuance.... The judge could have inquired of the juror how long his absence would be and have delayed the trial for that length of time."); *Dunkerley v. Hogan,* 579 F.2d 141, 148 (2d Cir.1978) (mistrial not "manifestly necessary" because 7–10 day continuance during defendant's illness was available option); *Reynolds v. Mabry,* 574 F.2d 978, 981–82 (8th Cir.1978) (defendant not denied a fair trial by week-long continuance due to illness of government witness). We do not believe the court's action exceeded the scope of its lawful powers.

*For these reasons, the judgment of the district court is*

*Affirmed.*