UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-2300
 UNITED STATES OF AMERICA,

 Appellee,
 v.

 AARON STERN,
 Defendant, Appellant.

 
No. 93-1047

 UNITED STATES OF AMERICA,
 Appellee,

 v.
 LAWRENCE GORDON,

 Defendant, Appellant.
 

 APPEALS FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]
 
 

 Before
 Boudin, Circuit Judge,
 

 Coffin and Campbell, Senior Circuit Judges.
 
 

Martin D. Boudreau for appellant Aaron Stern.
 
Lawrence Gordon on brief pro se.
 
Paul G. Levenson, Assistant United States Attorney, with whom
 
A. John Pappalardo, United States Attorney, was on brief for the
 
United States.

 

 January 20, 1994
 

 BOUDIN, Circuit Judge. The Miller Act, 40 U.S.C.
 

 270a-f requires all contractors bidding for government

construction contracts in excess of $25,000 to post

performance and payment bonds, and the Air Force further

requires that a bid bond accompany the bid itself.1 In

order to qualify for consideration, contractors must submit

bonds issued by companies approved by the United States

Treasury and listed in Treasury Department Circular 570,

commonly called the "T-list." See 48 C.F.R. 28.202(a)(1).
 

The bonds must also be submitted on standard government

forms: SF 24 (bid bond), SF 25 (payment bond) and SF 25A

(performance bond).

 Defendant Lawrence Gordon was the head of Tower

Associates, Inc., a Winchester, Massachusetts, construction

company seeking to secure a contract to renovate a

photography laboratory at Hanscom Air Force Base in Bedford,

Massachusetts. In September 1988 Tower submitted the low bid

for the project, offering to perform the renovations for

$1,000,200. This bid was accompanied by a bid bond issued by

Continental Surety Company, a surety or purported surety that

did not appear on the T-list and which apparently had no

 

 1"Bid bonds" ensure that a contractor will in fact
undertake the contract if its bid is accepted; "performance
bonds" guarantee that the contractor will complete the
project in accordance with the specifications; and "payment
bonds" ensure that those who furnish labor and materials for
the project will be paid.

 -2-

assets. The Air Force employee responsible for overseeing

the bidding process, Lorraine McLoughlin, did not at first

notice this problem and Tower was awarded the contract on

September 30, 1988.

 When shortly thereafter McLoughlin learned that

Continental was not an approved issuer, she called Gordon and

informed him that Tower's payment and performance bonds would

have to be written by a T-listed company. On October 17,

1988, Gordon presented a payment and performance bond

purportedly issued by Amwest Surety Insurance Co., a company

that did appear on the T-list. The bond bore Tower's seal,

as well as the signatures of Gordon and one "Alan Stime," who

was listed as Amwest's attorney-in-fact. The bond was

accompanied by a power of attorney, purportedly from Amwest,

also signed by "Alan Stime."

 The Amwest bond and power of attorney were counterfeits

fabricated by James Grier, the principal of Continental.

Grier later testified at trial that he produced the bogus

documents at Gordon's request. Sandra Catalano, a Tower

employee, testified at trial that she was present when the

bond was signed by Gordon and defendant Aaron Stern, who

signed the bond as "Alan Stime." At trial, an Amwest

official testified that the bond was not a genuine Amwest

bond and that no "Alan Stime" was or ever had been an

authorized attorney in fact for Amwest.

 -3-

 The Air Force rejected the phony bond after McLoughlin

noted that some of the signatures on the bond appeared to be

facsimiles and that the purported Amwest seal was poorly

impressed and illegible. On October 19, 1988, McLoughlin

requested that Tower resubmit its bonds and enclosed standard

government bond forms. The Air Force received a second set

of bonds, on the government forms, from Tower on October 24,

1988. These bonds were also purportedly issued by Amwest,

but the typed name of the attorney-in-fact under the "Alan

Stime" signature was "Aaron Stern." By this time, McLoughlin

had been told by an Amwest employee that Amwest "had never

heard of Tower Associates."

 Rather than accept the bonds, McLoughlin forwarded them

to the Air Force Office of Investigations and sent Tower a

notice to cure. On November 18, 1988, McLoughlin notified

Gordon of her communications with Amwest. After requesting

an extension of time to submit new bonds, Tower sent

McLoughlin a third set of bonds on December 13, 1988,

explaining that Tower "[had been] given a bond which proved

invalid." This third set of bonds, like the original bid

bond, was issued by Continental and signed by Aaron Stern as

attorney-in-fact. As Continental was still not on the T-

list, McLoughlin rejected the bonds.

 The Air Force terminated Tower's award on March 3, 1989,

and eventually awarded the contract (without rebidding) to

 -4-

Fellsway, Inc., which had submitted the second lowest bid.

On June 13, 1991, Gordon and Stern were charged in a multi-

count indictment with the following offenses:

 Count 1 Gordon and Stern were both charged with
 conspiring to defraud the United States in the
 solicitation and award of the construction
 contract at Hanscom Air Force Base. 18 U.S.C.
 371 (conspiracy to defraud).

 Count 2 Both defendants were charged with
 counterfeiting the October 17, 1988, payment
 and performance bond purportedly issued by
 Amwest Surety Insurance Company. 18 U.S.C. 
 494 (making, uttering or presenting
 counterfeit bond).

 Count 3 Gordon was charged with knowingly presenting
 the same counterfeit bond to the Air Force. 18
 U.S.C. 494.

 Count 4 Gordon and Stern were both charged with
 uttering to the Air Force a counterfeit power
 of attorney. 18 U.S.C. 495 (making, uttering
 or presenting counterfeit power of attorney).

 Count 5 Both defendants were charged with false
 statements in completing and submitting
 Standard Form 25, the government form for
 performance bonds. 18 U.S.C. 1001 (false
 statement statute).

 Count 6 Both defendants were charged with false
 statements in completing and submitting
 Standard Form 25A, the government form for
 payment bonds. 18 U.S.C. 1001.

 After a jury trial, Stern was convicted on counts 1 and

4, and acquitted on count 2. Gordon was convicted on count 3,

and acquitted on counts 1, 2 and 4. Both defendants were

convicted on Counts 5 and 6. Gordon moved for a new trial on

June 19, 1992, arguing that the verdict was internally

inconsistent and that the government had withheld material

 -5-

exculpatory evidence. The district court denied this motion

on December 18, 1992.

 On October 13, 1992, the district court sentenced Stern

to a 60-day term of imprisonment, along with a period of

supervised release. Gordon was sentenced on November 24,

1992, to a 30-day term of imprisonment and nine months of

home confinement. Both defendants were also held jointly and

severally liable for restitution.2 These consolidated

appeals followed. Stern's counsel has briefed and argued the

case; Gordon, with this court's permission, has relied upon

his district court filings in support of a new trial.

 In this court both defendants claim that the jury

verdicts are internally inconsistent. Gordon argued in the

district court that since he was acquitted (under count 2) of

counterfeiting the October 17 bond, it was inconsistent for

the jury then to convict him (under count 3) of uttering the

same counterfeit bond. Stern points to his own acquittal of

the charge of counterfeiting the bond (again under count 2)

and protests that this acquittal undermines the jury verdict

convicting Stern (under count 4) of uttering a forged power

of attorney in support of the same bond.

 

 2Stern's sentence was stayed pending appeal. The
district court denied Gordon's motion for a similar stay on
January 19, 1993, but this court stayed the payment of
Gordon's restitution pending appeal on August 24, 1993.

 -6-

 Both objections lack merit. As the defendants purport

to recognize, general jury verdicts may not normally be set

aside for inconsistency as between counts. United States v.
 

Powell, 469 U.S. 57, 64-65 (1984); United States v.
 

Bucuvalas, 909 F.2d 593, 597 (1st Cir. 1990). The reasons
 

are explained by Judge Friendly in United States v. Maybury,
 

274 F.2d 899 (2d Cir. 1960), and do not need repeating.

Maybury is relied on by both defendants because the appeals
 

court there did set aside verdicts as inconsistent. But the

inconsistent verdicts were there rendered by a judge in a
 

jury-waived trial. The whole point of Maybury is that (for
 

both practical and historical reasons) the general verdict by

a jury is a special case but a requirement of consistency

does apply to written findings made by a single judge. Id.
 

at 903.

 We need not discuss other inconsistent-verdict cases

cited by defendants because, as it happens, there is no

necessary inconsistency in the verdicts in this case. As to

Gordon, there was evidence from Grier that he (Grier)

fabricated the October 17, 1988, bond, but also evidence that

Gordon knew it was counterfeit and nevertheless presented it

to the Air Force. The jury may have supposed (quite wrongly)

that Grier's admission entirely lifted responsibility for the

counterfeiting from Gordon's shoulders but also permissibly

 -7-

believed that Gordon uttered the bond knowing it to be

forged.3

 Similarly, the acquittal of Stern on the charge of

counterfeiting the same bond, again quite possibly because of

Grier's admission, is in no way inconsistent with Stern's

conviction for uttering to the Air Force the companion power

of attorney document knowing it to be forged. In addition to

other evidence to support the uttering conviction, there was

direct testimony from Sandra Catalano that Stern himself

signed the bond using the phony signature "Alan Stime." 

 Whether or not Stern, Gordon or both could have been

convicted of procuring or participating in the counterfeiting

of the bond itself is irrelevant. It is sufficient to dispel

the taint of inconsistency that a rational jury could easily

have acquitted on count 2 while convicting Gordon on count 3

and Stern on count 4. And, as explained at the outset,

inconsistency would not in any event undermine the

convictions so long as they themselves were, as they are

here, supported by sufficient evidence. See Powell, 469 U.S.
 

at 67.

 

 3Gordon's claim that the conspiracy acquittal (under
count 1) is inconsistent with the uttering conviction (under
count 3) is even more far-fetched. True, the uttering was
charged as an act in furtherance of the conspiracy. But a
literal minded jury might believe that the uttering itself
was proved amply but that the "agreement" element of
conspiracy had not been established.

 -8-

 Next, Gordon claimed in the district court that the

government violated its obligation, under Brady v. Maryland,
 

373 U.S. 83 (1963), to produce exculpatory evidence by

failing to turn over the grand jury testimony of Grier, whom

Stern called as a witness. The background is this: Grier,

called by Stern as a defense witness, was then cross-examined

by Gordon's counsel--not by the government. On this cross-

examination, Grier proceeded to testify that Gordon had asked

Grier to forge the October 17, 1988 bond. Although Gordon

was acquitted of that forgery, he was convicted of uttering

the forged bond, and the Grier testimony--elicited by

Gordon's own counsel--may have helped to confirm Gordon's

knowledge of the forgery.

 After conviction Gordon learned that Grier, testifying

in the grand jury prior to trial, had himself denied any

knowledge of the bond. Gordon moved for a new trial,

contending that the government's failure to produce the grand

jury testimony at trial as impeaching evidence violated its

obligation under Brady. In pre-trial requests Gordon had
 

asked in general terms for Brady material, but he had never
 

specifically requested production of prior statements or

testimony by Grier. The district court denied the new trial

motion, citing United States v. Pandozzi, 878 F.2d 1526 (1st
 

Cir. 1989), and United States v. Carrasquillo-Plaza, 873 F.2d
 

10 (1st Cir. 1989).

 -9-

 Under the Jencks Act, 18 U.S.C. 3500, the government

is required to produce prior statements by its own witnesses,

whether or not the statements are exculpatory. And, if a

statement is itself exculpatory, the government under Brady
 

is normally required to produce it, regardless of whether it

is made by a trial witness. See Brady, 373 U.S. at 86. Here,
 

says the government, Grier's grand jury testimony was not a

prior statement by a government witness, nor was it

exculpatory in the sense that it disproved Gordon's guilt. 

 Thus, in the government's view, the grand jury testimony

is merely newly discovered impeaching evidence. Under the

Wright-Martin standard for a new trial based on newly
 

discovered evidence, the ordinary requisites for a new trial

on this ground are specific and demanding.4 Gordon may not

have met any of the requisites, and he certainly did not meet
 

the requirement that the newly discovered evidence be (at

least in the normal case) "not merely . . . impeaching."

Martin, 815 F.2d at 824 (quoting Wright, 625 F.2d at 1019).
 

 

 4A new trial will ordinarily be denied absent a showing
that
 (1) the evidence was unknown or unavailable to the
 defendant at the time of the trial; (2) failure to
 learn of the evidence was not due to lack of
 diligence by the defendant; (3) the evidence is
 material, and not merely cumulative or impeaching;
 and (4) it will probably result in an acquittal
 upon retrial of the defendant.

United States v. Martin, 815 F.2d 818, 824 (1st Cir.), cert.
 
denied, 484 U.S. 825 (1987) (quoting United States v. Wright,
 
625 F.2d 1017, 1019 (1st Cir. 1980)).

 -10-

 Thus Gordon's only hope is to argue that the grand jury

testimony did have to be produced under Brady in which event,
 

as the government notes, the Wright-Martin standard does not
 

invariably apply. See United States v. Sanchez, 917 F.2d 607,
 

617 (1st Cir. 1990), cert. denied, 499 U.S. 977 (1991).
 

Rather, there is a general obligation to produce exculpatory

testimony and failures to comply are reviewed after the fact

under the standard of United States v. Bagley, 473 U.S. 667
 

(1985). Bagley is somewhat opaque, there being no single
 

majority opinion, but reversal may be warranted where there

is a "reasonable probability" that the undisclosed evidence

would havealtered the outcome. Id. at 682(plurality opinion).
 

 Here the grand jury testimony was not exculpatory in the

sense that, reading the bare language before trial, an

assistant U.S. attorney would think it helpful to Gordon.

After all, in the testimony Grier denied knowledge of the

forgery, a position that could be neutral in its impact on

Gordon or even potentially harmful to Gordon (in shifting

responsibility to someone other than Grier). Only after

Grier, as a defense witness for Stern, named Gordon as the

procurer of the forgery did the grand jury testimony take on

a potential as impeaching evidence.

 The government protests that it has no ongoing

obligation to monitor the testimony of defense witnesses and

to seek out prior statements in its files that may in the

 -11-

course of trial turn out to have impeachment value when

defense testimony injures a defendant. Even if it did have

such an obligation in some instances, there would be serious

questions--not easily answered on this record--whether in

this case Gordon's own access to Grier negated the

obligation, see United States v. Hicks, 848 F.2d 1, 3-4 (1st
 

Cir. 1988), and whether the failure of Gordon to request the

grand jury testimony is also fatal to the Brady claim. Cf.
 

18 U.S.C. 3500(b) (request by defendant required under

Jencks Act); Carrasquillo-Plaza, 873 F.2d at 13 (failure to
 

make a specific request for alibi witness statements).

 We think that these interesting questions had best await

another occasion. It is enough in this case that the

impeaching evidence, even if made available to Gordon, could

not conceivably have altered the outcome. See generally
 

Pandozzi, 878 F.2d at 1528-30. The jury acquitted Gordon on
 

the counterfeiting count despite Grier's direct inculpation

of Gordon; and the knowledge element of the uttering count,

on which Gordon was convicted, was confirmed by the direct

testimony of another witness, Catalano, as well as much else

in Gordon's conduct. Under Bagley, the impeaching evidence
 

does not remotely "undermine confidence" in the outcome. 473

U.S. at 682.

 The final issue in this case is the most perplexing and

relates solely to sentencing. Under the Sentencing

 -12-

Guidelines,5 the amount of "the loss" is a specific offense

characteristic of crimes involving fraud or deceit, and the

base offense level (6 levels) is increased by a specified

number of levels (from 0 to 11 additional levels) depending

on the amount of the loss. U.S.S.G. 2F1.1 (1988). The

adjusted offense level, together with criminal history,

determines the sentencing range, and actual loss may also be

the basis for a restitution order. 18 U.S.C. 3663(b)(1).

 In this case, following the pre-sentence report, the

district court found that the loss to the Air Force of the

fraudulent activities in this case was "the difference

between the bid price [by Tower] and the award [to Fellsway,

the second lowest bidder] for $88,477, increased by the

restated administrative costs of $250" involved in reawarding

the contract to Fellsway. The resulting figure, $88,727,

increased the base offense level from 6 to 11, U.S.S.G. 

2F1.1(b)(1) (1988), and this in turn was increased to 13 by

 

 5The pre-sentence report referred to the 1988
guidelines, which were in effect when the crime was
committed. Current practice would normally invoke the
guidelines in effect at the time of sentencing--the 1991
version for Stern and the 1992 version for Gordon--barring
any ex post facto problems. See Isabel v. United States, 980
 
F.2d 60, 62 (1st Cir. 1992). But since the 1991 and 1992
guidelines employ a new loss/increase- in-level table which
would have resulted in a higher base offense level for both
Stern and Gordon than provided for under the 1988 guidelines,
we cite to the 1988 version. See United States v.
 
Harotunian, 920 F.2d 1040, 1042 (1st Cir. 1990).
 

 -13-

the addition of two more levels for "more than minimal

planning." Id. 2F1.1(b)(2).
 

 The loss attributed to Stern may well have had no effect

on his sentence of confinement; a downward departure, based

on assistance to the government, reduced his confinement to

below the minimum range that would have prevailed if no loss
 

had been attributed to him. Gordon's sentence of

confinement, also based on a downward departure, might or

might not have been affected by a lower loss figure,

depending on how small a loss was imputed.6 But based on

the imputed loss of $88,727, both defendants were ordered to

pay restitution--Stern to pay $88,727 and Gordon $80,000--so

the importance of the loss figure is obvious.

 At this point, some procedural history is needed. In

the district court, both defendants challenged the $88,727

loss figure on somewhat different grounds. Then, while these

appeals were pending, someone apparently happened upon Judge

Posner's decision in United States v. Schneider, 930 F.2d 555
 

(7th Cir. 1991), which undoubtedly made the government uneasy

about the loss calculation in this case. In any event, the

government and defendants entered into a joint stipulation,

 

 6Gordon's departure was based on the theory that the Air
Force could have rebid the entire contract for $10,000 (a
figure supplied by the Air Force), instead of merely awarding
it to the previous second lowest bidder. Cf. United States
 
v. Gregorio, 956 F.2d 341, 344-48 (1st Cir. 1992). The
 
government did not appeal this departure.

 -14-

proposing that this court remand the case, before deciding

the merits, for resentencing in light of Schneider; and the
 

parties stipulated further that

 1. The parties jointly stipulate that the best
 readily calculable measure of the loss from the
 offenses of conviction, for purposes of applying
 the Sentencing Guidelines, is $ 20,450. This
 amount includes both an attempted gain of $ 20,200
 (the purchase price for a genuine bond of the kind
 that was forged in this case), and actual
 consequential losses of $ 250 (the immediately
 identifiable administrative costs associated with
 the re-awarding the Photolab contract). For
 purposes of ordering restitution, only the actual
 loss figure, $ 250 is subject to restitution.

 2. The United States further reserves the right to
 argue that the stipulated amount--while
 representing the best readily ascertainable
 estimate of loss--understates the full extent of
 the loss in question. The United states further
 reserves the right to argue that, given the small
 sum of restitution payable, fines should be imposed
 upon each defendant, in an amount to be fixed in
 light of the defendants' resources.

 This court denied the motion to remand, believing that

the challenges to the convictions ought to be decided before

any remand for fine-tuning the sentences. Stern, taking the

view that the stipulation was binding only if this court

ordered an immediate remand, has argued in his brief in this

court that no loss, apart perhaps from the $250 involved in
 

shifting the award to the second bidder, has been shown by

the government. The government adheres to its request for a

remand in accordance with the stipulation, arguing that Stern

has waived the contention he now makes. Gordon has urged

nothing beyond the stipulation.

 -15-

 It would be a hazardous venture to lay down abstract

rules as to how "loss" is to be calculated under the

governing guideline even if the focus were narrowed to false

statements in bid documents. As Judge Posner made clear in

Schneider, the underlying facts of individual cases may
 

differ widely, and even in comparable situations, what proof

is available as to specific items of loss will vary from case

to case. See 930 F.2d at 557-59. Further, we note that the
 

deceptively simple notion of "loss" is elaborated under the

guideline to include situations of foreseeable or intended

losses, see U.S.S.G. 2F1.1, application note 7 (1988), and
 

in later versions to cover various specific types of fraud,

e.g., id., application note 7(e) (1993) (Davis-Bacon Act
 

fraud).

 If we agreed with the district court's original

calculations of loss, we would not remand the case regardless

of the stipulation of the parties, since the parties cannot

by agreement create error where none exists. On this record,

however, we think that there is no basis for mechanically

measuring the loss as the difference between the two bids.

The problem is that the government never showed that it could

have secured a bid from a properly bonded contractor at the

price offered by Tower. Without such evidence, it is hard to

see how the government can measure its loss on the theory

 -16-

that, but for the fraud, it would have enjoyed that initial

low price.7

 On certain facts--say, a general increase in the level

of second round bids after a rebidding due to fraud--a

calculation of loss based on the differential between a

tainted first-round best bid and a higher second-round best

bid might be entirely persuasive. But here the government

simply took the second best first-round bid with no

rebidding; and its administrative costs in shifting the award

from Tower to Fellsway were admittedly minimal ($250). The

probation reports and the government urged the loss figure

adopted by the district judge, and the defendants while

protesting did little to undermine it. Yet the government

itself no longer supports the $88,275 figure, and we can find

no basis to sustain it on the present record.

 Conversely, we reject Stern's "no loss at all" argument,

at least so far as concerns the guideline calculation. The

section 2F1.1 guideline commentary, from the 1988 version

(application note 7) to the present 1993 version (id.), has
 

included the "probable" or "intended" or "expected" loss

 

 7It is true that if the Amwest bond had been a real bond
instead of a forgery, then the government would have enjoyed
the original low price; and in this sense the forgery may
seem like the cause of that loss. But there is no evidence
 
that Tower Associates could ever have secured a real bond by
a T-list surety or, if it could, that its bid would have been
as low. Indeed, Continental seems to have been an off-shore
"front" for contractors who could not get T-list bonding.

 -17-

threatened by a defendant's conduct as an alternative measure
 

of loss if that figure can be determined and is larger than

actual loss. The evident purpose of the alternative is to be

certain that attempted fraud does not escape all adjustments

based on magnitude merely because the fraud miscarried. We

think that this is just such a case where the foreseeable

loss exceeded the actual loss.

 It was plainly foreseeable at the time of the fraud that

the Air Force might be deceived by the phony Amwest bond and

might finally award the contract to Tower. At that point, it

is hard to know the precise risk of loss imposed on the

government, for it would depend on many circumstances

including the likelihood that Tower would flawlessly complete

the contract. Yet "the amount of loss need not be precise,"

U.S.S.G. 2F1.1, application note 7 (1988); and, broadly

speaking, to inflict a phony construction-contract bond on

the government exposes the government to the average cost of
 

failure to perform the contract adjusted by the average risk
 

of failure to perform. That adjusted figure should also be

the approximate price of the average bond for such a project.

Of course, the pertinent figure could be higher if the

government sought to prove that Tower was a high-risk

contractor and would have been charged more for a valid bond.

 -18-

 To assume that the phony bond might well be accepted is,

in a case like this one, entirely fair. It is the

defendants' intended outcome and, given possible carelessness

by administrators or merely a good forgery, it is normally a

realistic likelihood. From the standpoint of the guideline's

"intended or probable loss" criterion, we see nothing wrong

with the use of the cost of a valid bond as a fair proxy for

the potential loss caused by the uttering of the phony bond

and forged power of attorney. In this case, the potential

was not realized, but it was still intended or reasonably

likely and thus a proper measure of loss under the guideline.

 Consequently, we think that the principle underlying the

first paragraph of the quoted stipulation is a legitimate

basis in this case for calculating loss under the guideline;

whether the $20,200 figure is binding on Stern is a matter

that can be resolved on remand if Stern seeks to disclaim the

stipulation.8 Of course, the government did not offer such

evidence of bond cost in the original sentencing proceeding;

but where a sentence is vacated and remanded for

redetermination under correct principles, the government is

not automatically foreclosed from offering evidence pertinent

 

 8The district court is not required to accept a
stipulation on an issue of fact pertinent to sentencing, but
is free to do so given the apparent reasonableness of the
proposed figure. This assumes, of course, either that Stern
withdraws his disclaimer (as he would plainly be wise to do)
or that the district court decides that his initial
acceptance of the stipulation is binding in any event.

 -19-

to the newly announced rule. See United States v. Sepulveda,
 

1993 U.S. App. LEXIS 33020, *107 n.31 (1st Cir., Dec. 20,

1993).

 Restitution is a different matter. We agree with the

government's concession that the intended or probable loss

cannot be the measure of restitution: it is one thing to

base a criminal sentence on the magnitude of threatened harm

but quite another to "restore" to the government money that

it never lost. Here, the actual loss is only the $250

administrative cost of reawarding the contract. Given the

common interrelationship between fines and restitution, we

see no reason why the government should not be allowed to

argue for a fine on remand.

 Accordingly, the judgment of conviction in each case is

affirmed, and the sentence and the orders of restitution in
 

each case are vacated and the cases are remanded for
 

resentencing in accordance with this opinion. Further

proceedings on remand are for the district court to determine

in the first instance.

 It is so ordered.
 

 -20-